**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Martin,* Slip Opinion No. 2017-Ohio-7556.]**

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2017-OHIO-7556

THE STATE OF OHIO, APPELLEE, *v*. MARTIN, APPELLANT.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Martin,* Slip Opinion No. 2017-Ohio-7556.]**

*Criminal law—Aggravated murder—Convictions and death sentence affirmed.*

(No. 2014-1922—Submitted June 6, 2017—Decided September 13, 2017.)

APPEAL from the Court of Common Pleas of Trumbull County,

No. 2012 CR 735.

_____

FRENCH, J.

{¶ 1} This is a death-penalty appeal of right. Appellant, David Martin, shot Jeremy Cole to death and attempted to kill Melissa "Missy" Putnam during a kidnapping and robbery at Putnam's home in Warren. A jury found Martin guilty of aggravated murder with three death specifications, and he was sentenced to death. For the reasons below, we affirm his convictions and death sentence.

## I. BACKGROUND

{¶ 2} Putnam was a small-scale marijuana dealer. According to Putnam, Martin was at her house buying marijuana on September 26, 2012. She noticed that

he was carrying a gun. Although she had known him only a few months, she invited him to come back the next day to smoke "blunts."

{¶ 3} On the morning of September 27, Putnam contacted her friend Jeremy Cole to ask for a ride so that she could look for a job. He picked her up later that morning, and she applied for work at various places. They returned to Putnam's house around 10:30 or 11:00 a.m.

{¶ 4} While Cole and Putnam were talking in her living room, Martin knocked on the door. Cole invited him in. Martin entered and sat on the couch next to Putnam. Marijuana belonging to Putnam was lying on a nearby table. Martin rolled a blunt, which was passed around. As they smoked, Martin got up twice to go into the kitchen. When he came back the second time, he had a gun in his hand. Putnam recognized it as the same gun she had seen him carrying the day before.

{¶ 5} Martin approached Cole, pointing the gun at his face. Martin called Cole a "child molester" and stated that he had been paid $5,000 to kill him. Martin ordered Cole to sit on the couch with Putnam.

{¶ 6} At some point, according to Putnam, Martin took offense at something Cole said. Martin told him to shut up, then made him lie face down on the floor with his hands behind his back. Martin then ordered Putnam to tie Cole's hands. Using a phone-charger cord, she tied his hands together loosely. Then Martin had her tie her own hands together with an extension cord. Evidently dissatisfied with Putnam's work, Martin said, "[Y]ou think I'm playing with you? Tie him up." She retied Cole's hands more securely, though her own hands were bound.

{¶ 7} Martin dumped the contents of Putnam's purse onto a chair and took her phone and about $100 in cash. He also took her marijuana from the table. He made Cole and Putnam go into Putnam's bedroom and lie on the bed. He went through Cole's pockets and took Cole's phone.

**{¶ 8}** Martin asked Cole where his money was. Putnam told him that Cole was "a young kid" with no money. Martin then put his gun to Cole's head and asked where Cole's car keys were. Cole said that his girlfriend had them and that she would be back in an hour. Putnam said, "Jeremy, don't lie to him. Let's just get him out of this house." She offered to help Martin find the keys.

**{¶ 9}** Martin retied Putnam's hands behind her back, and she accompanied him to the living room, where they looked for the keys. Martin then took Putnam into her daughter's bedroom and made Putnam lie face down on the floor. Martin said: "I promise I'm not gonna let nothing happen to you, but I can't speak for" Cole. He covered Putnam's head with a towel or shirt, then went back to Cole.

**{¶ 10}** Putnam heard a struggle in the other bedroom. Then "[i]t got quiet." Lying on the floor, after using her chin to move the covering slightly, Putnam could see Martin's legs in the hallway outside her bedroom. Putnam testified that Martin walked out of her view and into the kitchen and that she heard him opening cupboards and drawers there. Then Martin returned to Cole.

**{¶ 11}** Putnam heard Cole say, "Oh, my God. I can't breathe." Then there was quiet. Martin came out and paced nervously, then went back into the room with Cole. Putnam heard Cole say: "Get out, Missy. * * * He's about to shoot me." She then heard a shot.

**{¶ 12}** Putnam freed one of her hands. Looking up, she saw Martin standing over her. She put her hand over her face and said, "Please don't shoot me in the face." He said, "I'm sorry, Missy," and shot her. The bullet passed through Putnam's right hand and entered her neck, leaving fragments in the right side of her neck near the base of her skull.

**{¶ 13}** According to Martin's subsequent confession, he left the crime scene on foot, walking "from the west side [of town] to the east side." On his way back, he stopped underneath a bridge. There he removed his wristwatch and clothes,

except for a pair of shorts, and burned them. By 1:00 p.m., according to his girlfriend, Martin had returned home and taken a shower.

{¶ 14} Meanwhile, Putnam regained consciousness, climbed out a window and fled to the house of a neighbor, who called 9-1-1. Warren police officers were dispatched. Putnam met them and directed them to her house.

{¶ 15} Officers found Cole face down on the bedroom floor, alive but breathing shallowly. His hands were tied behind his back with the cord of Putnam's bedroom alarm clock, rather than the phone cord Putnam had used. He was taken to Trumbull Memorial Hospital, where he died.

{¶ 16} While examining the crime scene, a detective recovered a shell casing from the bed in Putnam's bedroom and another from the floor of the other bedroom. He later sent these to the Ohio Bureau of Criminal Identification and Investigation ("BCI").

{¶ 17} Dr. Humphrey D. Germaniuk, the Trumbull County coroner, performed an autopsy on Cole's body the next day. Dr. Germaniuk noted that Cole had been shot once between the eyes and concluded that the shot had been fired from a distance of three to eight inches. He concluded that Cole had died of a penetrating gunshot wound to the head. Dr. Germaniuk recovered the jacket of the bullet from Cole's brain and the core from the rear of his skull. These were sent to BCI.

{¶ 18} Detective Wayne Mackey interviewed Putnam on September 27. She described the shooter. Mackey assembled and presented to Putnam two photographic lineups—one that day and one on October 1—but Putnam did not identify anyone from either lineup. After further investigation, Mackey put together another lineup on October 1. This one contained Martin's photograph. When presented with this lineup, Putnam immediately and emphatically identified Martin. The next day, Mackey obtained a warrant for Martin's arrest.

**{¶ 19}** On October 16, 2012, a unit of the Northern Ohio Violent Fugitive Task Force arrested Martin in Tallmadge at the apartment of David Fleetwood. During the arrest, task-force officers seized a loaded .40-caliber semiautomatic handgun. Deputy United States Marshals William Boldin and Anne Murphy, task-force members, transported Martin to the Warren police station by way of the Summit County jail in Akron.

**{¶ 20}** Martin made several incriminating statements to Boldin and Murphy while in their custody. Before being transported, he admitted that the gun was his. En route to Akron, he made the following remarks: "I did what I had to do." "I can accept the needle. I did what I did, but I had to." "I'm the trigger man. You got the gun. I'm hit. I got no reason to lie."

**{¶ 21}** On the way from Akron to Warren, Martin asked the marshals whether they would like to see where he had burned his clothes on the night after the shootings. Boldin said that he would, and Martin directed them to the site under the bridge. He mentioned that he had burned a watch but that it did not burn completely. His directions led the marshals to a pile of burned material, which included a partly melted watchband. The marshals then drove Martin to the Warren police station, where Detective Mackey interrogated him after advising him of his *Miranda* rights.

**{¶ 22}** Martin readily admitted shooting Cole and Putnam but denied robbing them. In Martin's version, he had some sort of dispute with Putnam over money and felt threatened by her words and actions. He claimed that he drew his gun only after Putnam and Cole went into another room and he overheard Cole say, "Let's do his ass."

**{¶ 23}** Martin specifically denied tying up either victim. According to Martin, at some point—the sequence is unclear—Putnam tied Cole up. Sometime after that, Martin claimed, he shot Putnam, then had a brief conversation with her. Martin said that he shot Cole after Putnam. He admitted that the gun recovered

during his arrest was the one he had used to shoot the victims. (Ballistics analysis by BCI confirmed this.) He also told Detective Mackey that he fired a total of two shots, which comported with the autopsy findings and Putnam's medical records.

{¶ 24} Martin was indicted on two counts of aggravated murder. Counts 1 and 2 charged Martin with the aggravated murder of Cole. Count 1 charged Martin with felony-murder under R.C. 2903.01(B). Count 2 charged murder with prior calculation and design under R.C. 2903.01(A). Each count carried three death specifications: course of conduct, R.C. 2929.04(A)(5); felony-murder, R.C. 2929.04(A)(7), predicated on kidnapping; and felony-murder predicated on aggravated robbery. The indictment also included six noncapital counts. Count 3 charged Martin with the attempted aggravated murder of Putnam. Counts 4 through 7 charged the aggravated robbery and kidnapping of Cole and of Putnam. Count 8 charged tampering with evidence.[1] Counts 1 through 7 carried firearm specifications, R.C. 2941.145.

{¶ 25} The jury found Martin guilty of all counts and specifications presented to it. The state elected to proceed to capital sentencing on Count 2. After a mitigation hearing, the jury recommended a death sentence. The trial judge weighed the aggravating circumstances against the mitigating factors and sentenced Martin to death. (On the noncapital counts, Martin received sentences adding up to 61 years of imprisonment.)

## II. JURY ISSUES

### A. Change of Venue

{¶ 26} In his first proposition of law, Martin contends that pervasive, prejudicial pretrial publicity denied him a fair trial and that the trial court erred by denying his motion for change of venue.

---

[1] The tampering charge, initially Count 10, was renumbered after the original Count 8 was severed and Count 9 was nolled.

**{¶ 27}** We will not reverse a trial court's venue ruling without a clear showing that the trial court abused its discretion. *State v. Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, 23 N.E.3d 1096, ¶ 91. An abuse of discretion is more than a mere error of law or judgment; it implies that a trial court's decision was unreasonable, arbitrary or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

**{¶ 28}** When a defendant claims that the trial court erred by denying a motion for change of venue on the ground of prejudicial pretrial publicity, our analysis proceeds in two steps. We first determine whether the record shows pretrial publicity of such a degree and kind as to trigger a presumption that the jury was prejudiced against the defendant. If not, we determine whether the defendant has established that any juror was actually prejudiced against him. *State v. Mammone*, 139 Ohio St.3d 467, 2014-Ohio-1942, 13 N.E.3d 1051, ¶ 57.

### 1. Pretrial Publicity and Presumptive Prejudice

**{¶ 29}** Jurors need not be totally ignorant of the facts of a case. *Irvin v. Dowd*, 366 U.S. 717, 722, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). The fact that many prospective jurors know something about a case is not dispositive of a motion for change of venue. *Thompson* at ¶ 102.

**{¶ 30}** In certain rare cases, pretrial publicity is so damaging that courts must conclusively presume prejudice even without a showing of actual bias. *See, e.g.*, *Rideau v. Louisiana*, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963); *Estes v. Texas*, 381 U.S. 532, 542-544, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); *Sheppard v. Maxwell*, 384 U.S. 333, 352-357, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). But this presumption "attends only the extreme case." *Skilling v. United States*, 561 U.S. 358, 381, 130 S.Ct. 2896, 177 L.Ed.2d 619 (2010); *accord State v. Treesh*, 90 Ohio St.3d 460, 464, 739 N.E.2d 749 (2001). To prevail on a claim of presumed prejudice, a defendant must make " 'a clear and manifest showing * * * that pretrial publicity was so pervasive and prejudicial that an attempt to seat a jury

would be a vain act.' " *State v. Warner*, 55 Ohio St.3d 31, 46, 564 N.E.2d 18 (1990), quoting *State v. Herring*, 21 Ohio App.3d 18, 486 N.E.2d 119 (9th Dist.1984), syllabus.

{¶ 31} Martin's argument focuses chiefly on news coverage of his alleged involvement in a hostage-taking incident at the Trumbull County jail. According to news reports, on April 23, 2014, Martin and two other inmates took a guard hostage, threatening him with a homemade knife but releasing him unharmed after more than five hours of negotiation. The incident received considerable media coverage between April 23 and 30, 2014 (mostly on April 23 and 24), and sporadic attention thereafter. No evidence about the hostage-taking incident was introduced at trial.

{¶ 32} Attached to Martin's motion for change of venue were three DVDs containing about 32 minutes of recorded television news broadcasts reporting on this incident. All of these broadcasts ran between April 23 and 25, 2014, most on April 23. At least one station interrupted prime-time programming to report the story. Two broadcasts played excerpts from Martin's audio-recorded telephone interview with a Cleveland TV station during the incident.

{¶ 33} Also attached to Martin's motion were 48 stories from newspapers (primarily the Youngstown *Vindicator* and Warren *Tribune Chronicle*) and news media websites, published from October 2012 to July 2014. A supplemental filing attached five more stories published during August 2014.

{¶ 34} Several articles contained information such as Martin's admissions of guilt, his alleged gang affiliations, his prior convictions, his shouting match with Putnam during a pretrial hearing, and his reported threat to "grab the first gun I can" at his upcoming trial. Twenty-one of the articles were published in April 2014 during the hostage incident or in its immediate aftermath.

**{¶ 35}** Martin likens this case to *Rideau*, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663.[2] Yet "*Rideau* has been held not to reach even the most highly publicized cases that are covered step-by-step and scoop-by-scoop in evening newscasts and front page stories." 6 LaFave, Israel, King, & Kerr, *Criminal Procedure*, Section 23.2(a), at 307-308 (4th Ed.2015); *see Mammone*, 139 Ohio St.3d 467, 2014-Ohio-1942, 13 N.E.3d 1051, at ¶ 60-68. A brief look at *Rideau* explains why.

**{¶ 36}** In *Rideau*, the sheriff's office had filmed an interrogation of the defendant, Rideau, in which he confessed to bank robbery, kidnapping, and murder. The confession was broadcast three times on television seven weeks before Rideau's trial for those crimes. Audiences of 20,000 to 53,000 saw the broadcasts in a total parish population of approximately 150,000. *Rideau* at 724. After "tens of thousands" had seen and heard Rideau "personally confessing in detail," the trial was a "hollow formality," and prejudice could be conclusively presumed "without pausing to examine a particularized transcript of the voir dire." *Id*. at 726-727.

**{¶ 37}** Pretrial publicity in Martin's case did not approach that level. "[T]he controlling factor in [*Rideau*] was the fact that the public *viewed* the confession in a televised format * * *; actually seeing and hearing the confession, as one would in a courtroom, would create a certainty of belief that would be difficult for the public to lay aside." (Emphasis sic.) *DeLisle v. Rivers*, 161 F.3d 370, 384 (6th Cir.1998) (en banc). But Martin's confession was never broadcast to the public. *Compare Mammone* at ¶ 63.

**{¶ 38}** Indeed, the pretrial publicity in this case cannot be fairly called "pervasive." Four months went by between the end of the hostage incident and the

---

[2] Martin also cites *Sheppard*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600, and *Estes*, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543, but those cases "are not particularly instructive because they 'involved media interference with courtroom proceedings *during* trial' " (emphasis sic), *Mammone*, 139 Ohio St.3d 467, 2014-Ohio-1942, 13 N.E.3d 1051, at ¶ 60, quoting *Skilling*, 561 U.S. at 382, 130 S.Ct. 2896, 177 L.Ed.2d 619, fn. 14. No such interference occurred in this case.

start of jury selection on August 28, 2014. Only 13 of the stories attached to Martin's venue motion and supplement were published after April 30 and only nine from June 28 to August 26.

**{¶ 39}** The record shows that few prospective jurors recalled the media coverage and that it left little impression even on those who did. The jury questionnaire in this case addressed pretrial publicity, asking whether the prospective jurors had "heard anything about David Martin before today" and whether they had "heard anything about this case before today." One hundred twenty-eight prospective jurors completed this questionnaire. Seventy-six of them, or 59 percent, answered "No" to both questions; that is, they did not recall hearing anything about either Martin *or* the case.

**{¶ 40}** Fifty-two prospective jurors (41 percent) responded that they had heard about the case, almost all through the news media, but 32 of those 52 had not formed any opinion about guilt or punishment based on pretrial publicity. Thus, 108 prospective jurors—84 percent of those who completed questionnaires—either had heard nothing at all about the case or had not been influenced by whatever they had heard. *Compare Irvin*, 366 U.S at 727, 81 S.Ct. 1639, 6 L.Ed.2d 751 (90 percent of prospective jurors had opinions on guilt; 8 of 12 jurors thought the defendant guilty before trial).

**{¶ 41}** As for the hostage incident, only one prospective juror indicated knowledge of the incident on the questionnaire. Another volunteered on voir dire that she knew of the incident, not through the media but because she was working next door to the jail at the time. The trial court excused both of these prospective jurors for cause.

**{¶ 42}** Moreover, only four venire members—including one of the two just mentioned—were excused because of exposure to pretrial publicity. "This * * * by no means suggests a community with sentiment so poisoned against [Martin] as to

impeach the indifference of jurors who displayed no animus of their own." *Murphy v. Florida*, 421 U.S. 794, 803, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975).

**{¶ 43}** On this record, we cannot find that this is one of the rare cases in which publicity was so pervasive and prejudicial that we must presume prejudice. Absent that presumption, "we conclude that the [trial court], in declining to order a venue change, did not exceed constitutional limitations." *Skilling*, 561 U.S. at 385, 130 S.Ct. 2896, 177 L.Ed.2d 619.

### 2. *Actual Juror Bias*

**{¶ 44}** Without a presumption of prejudice, a defendant claiming that pretrial publicity has denied him a fair trial must ordinarily show that one or more jurors were actually biased against him. *State v. Frazier*, 115 Ohio St.3d 139, 2007-Ohio-5048, 873 N.E.2d 1263, ¶ 235.

**{¶ 45}** Of the 12 persons seated on the jury, eight stated on their questionnaires that they had never heard of Martin and knew nothing about the case. During the guilt phase, an alternate juror replaced one of these eight. The alternate stated on his questionnaire that he had been exposed to pretrial publicity but had formed no opinion about the case. Three of the other seated jurors also had been exposed to pretrial publicity but likewise had formed no opinion.

**{¶ 46}** Finally, juror No. 7 stated on her questionnaire that she had read one or two newspaper articles about the case but did not remember much about it. While this juror admitted on her questionnaire to forming an opinion about who committed the charged shootings, she stated on voir dire that her only opinion about the case was that it was "bad" and said that she could "absolutely" set her opinion aside. She indicated on her questionnaire that she did not hold any opinion as to the appropriate sentence. On voir dire, she said that she had read about the case "back when it happened," not recently, and that she understood that what she had read was not evidence.

**{¶ 47}** The record does not show that any juror in this case was biased by pretrial publicity. Since Martin has "failed to establish [either] that a presumption of prejudice arose or that actual bias infected the jury that tried him," *Skilling*, 561 U.S. at 398, 130 S.Ct. 2896, 177 L.Ed.2d 619, we overrule his first proposition of law.

### B. Ineffective Assistance of Counsel on Voir Dire

**{¶ 48}** In his second proposition of law, Martin contends that his trial counsel rendered ineffective assistance in conducting voir dire. To establish ineffective assistance, Martin must show (1) deficient performance by counsel, i.e., performance falling below an objective standard of reasonable representation, and (2) prejudice, i.e., a reasonable probability that, but for counsel's errors, the proceeding's result would have been different. *Strickland v. Washington*, 466 U.S. 668, 687-688, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraph two of the syllabus.

### 1. Failure to Inquire about Hostage Incident

**{¶ 49}** Martin contends that defense counsel rendered ineffective assistance by failing to inquire on voir dire as to prospective jurors' knowledge of his alleged involvement in the hostage-taking incident four months before. He also argues that counsel should have asked juror No. 6, whose husband was a Trumbull County reserve deputy sheriff, whether she had discussed the hostage situation with her husband and whether he had had contact with Martin.

**{¶ 50}** In general, "it is for [trial] counsel to determine what questions should be asked on voir dire." *State v. Group*, 98 Ohio St.3d 248, 2002-Ohio-7247, 781 N.E.2d 980, ¶ 139. We have "consistently declined to 'second-guess trial strategy decisions' or impose 'hindsight views about how current counsel might have voir dired the jury differently.' " *State v. Mundt*, 115 Ohio St.3d 22, 2007-Ohio-4836, 873 N.E.2d 828, ¶ 63, quoting *State v. Mason*, 82 Ohio St.3d 144, 157,

12

694 N.E.2d 932 (1998); *see also Bradley* at 143-144 (failing to ask voir dire questions about pretrial publicity was not ineffective assistance).

{¶ 51} The decision of Martin's counsel not to ask prospective jurors what they knew about the hostage situation falls "within the wide range of reasonable professional assistance," *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052, 80 L.Ed.2d 674. The prospective jurors had already filled out questionnaires requiring them to disclose whether they had ever heard of Martin and, if so, what they remembered about him. The overwhelming majority were unaware of Martin's alleged involvement in the hostage incident. Presumably, defense counsel wanted them to *stay* unaware of it.

{¶ 52} Had Martin's counsel asked specific questions about the incident, they would have disclosed a potentially prejudicial fact to many prospective jurors who otherwise would not have known about it. Counsel could have reasonably calculated that (1) revealing the incident to prospective jurors would harm Martin's chance of avoiding a death sentence and (2) this risk outweighed the possibility that questioning might reveal a few prospective jurors who knew about the incident but had failed to mention it on their questionnaires. Counsel's decision to avoid disclosing the hostage incident to prospective jurors by asking them about it did not fall below an objective standard of reasonable representation and hence did not constitute "deficient performance," *id.* at 687.

{¶ 53} Nor has Martin shown that his counsel's choice resulted in prejudice. None of the 12 jurors who found Martin guilty and recommended his death sentence indicated any knowledge of the hostage incident on their questionnaires. Nothing in the record shows a reasonable probability that the result of the trial would have been otherwise if Martin's counsel had asked about the incident on voir dire.

### *2. Failure to Inquire about Pretrial Publicity*

{¶ 54} Martin complains that defense counsel did not question four jurors (Nos. 4, 8, 10, and 12) on pretrial publicity, even though each admitted on the questionnaire or on voir dire that he or she had been exposed to publicity.

{¶ 55} The questionnaires of juror No. 4 (originally an alternate juror but ultimately seated to replace the original juror No. 4) and juror No. 12 indicated minimal exposure. Juror No. 4 stated that his exposure consisted of "[j]ust once * * * glancing at headlines while standing in line." Juror No. 12 indicated that he had seen one brief newspaper article about the case. On voir dire, he said that he had formed no opinion and could set aside what he had read.

{¶ 56} Juror No. 8 knew "a little bit" about the case. She recalled hearing about the crimes when they happened (nearly two years before) and had recently seen an article on the upcoming trial. But on voir dire, she appeared to have only a vague memory of what she had heard and she stated that she could disregard it. She understood that what one hears in the media is not always true. She had formed no opinion about Martin or his guilt or innocence.

{¶ 57} Juror No. 10 stated on voir dire that he had seen the end of a news report about the case the previous night while making dinner but had formed no opinion from it. Martin claims that his counsel "did not ask [juror No. 10] one question" about pretrial publicity, but this is incorrect. Defense counsel asked: "[D]o you remember anything else other than you told [the prosecutor] about what you saw?" The juror said, "No. Like I said, I just happened to see it. When I first saw it, I wasn't even sure it was the same case * * *. * * * And I just heard a little bit of it." Given that the juror had already said, under oath, that he had formed no opinion from seeing this snippet, defense counsel could reasonably have concluded that further inquiry on this point would not be worthwhile. Martin has not shown that counsel's voir dire performance with respect to any of these jurors fell below an objective standard of reasonable representation.

**{¶ 58}** Martin also complains that defense counsel asked prospective juror No. 74 only one question about pretrial publicity and failed to "follow up" by inquiring into this venire member's ability to consider mitigation. But prospective juror No. 74 did not sit on the jury. So even if counsel's performance in questioning him was deficient, there was no prejudice.

### 3. Insufficient Inquiry into Attitudes on Death Penalty

**{¶ 59}** Martin argues that defense counsel should have questioned juror Nos. 5 and 7 more deeply about their attitudes on the death penalty to determine whether they would automatically vote to recommend a death sentence. *See generally Morgan v. Illinois*, 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992) (automatic-death-penalty jurors are biased and may not sit on capital case).

**{¶ 60}** But defense counsel did question both jurors on this point, and both gave responses showing that they were not automatic-death-penalty jurors. Juror No. 5 said that Martin's history and background would be important in deciding between life imprisonment and the death penalty "[b]ecause * * * I think it might have a lot to do with why he did what he did." Similarly, juror No. 7 stated that in deciding between life and death, she would "have to" consider how Martin was raised and what influences shaped him.

**{¶ 61}** Martin cites *Morgan* for the proposition that a juror may be biased in favor of the death penalty despite giving affirmative answers to "general questions of fairness and impartiality," *id.* at 735. But the questions defense counsel asked juror Nos. 5 and 7 were not "general questions of fairness and impartiality," nor were their responses mere general pledges to be fair. These were specific responses to specific questions about whether the jurors would consider Martin's background and upbringing in determining his sentence. There is no reason, beyond rank speculation, to suppose that further questioning would have elicited different responses.

**{¶ 62}** Martin also complains that his counsel did not attempt to rehabilitate prospective juror No. 53, who was excused for cause after stating three times that she could not impose the death penalty and twice that she did not know whether she could. Prospective juror No. 53 was asked five times whether she could impose the death penalty, and she never once said that she could. Defense counsel were surely not unreasonable in declining to ask the same question a sixth time.

### 4. Insufficient Inquiry into Potential Personal Biases
#### a. Juror Who Knew Victim

**{¶ 63}** Juror No. 9 had been a co-worker of Jeremy Cole's for about a month and had seen him at work on the day of the murder. However, they were not friends. Juror No. 9 said that he could set aside his acquaintance with Cole and would not take "greater offense" because Cole was the victim as opposed to "anyone else."

**{¶ 64}** On voir dire, defense counsel asked juror No. 9, given that he had known Cole: "What would you do?" The juror responded: "Be fair." Counsel further asked: "Even if it means taking some heat from Jeremy Cole's family in the event you do not take this man's life?" Juror No. 9 again answered: "Yep. Be fair."

**{¶ 65}** The defense challenged this juror for cause on the sole ground of his having known Cole. The trial court overruled the challenge. *See State v. Sheppard*, 84 Ohio St.3d 230, 235, 703 N.E.2d 286 (1998) (under Crim.R. 24(B), fact that prospective juror knew victim is not per se basis for dismissal for cause).

**{¶ 66}** Martin focuses on juror No. 9's "be fair" responses to defense counsel. He argues that under *Morgan*, 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492, these responses are insufficient because the juror may have believed that "being fair meant [e]nsuring the man who killed his co-worker was put to death." For this reason, he contends, defense counsel should have asked the juror more specific questions to elicit what his idea of "fairness" was.

**{¶ 67}** Martin's argument ignores the juror's previous responses. The trial court specifically had asked juror No. 9 whether, having known the victim and

spoken with him on the day of his murder, he could "set all of that aside," and he had responded, "Yes." The juror had stated that he would not take "greater offense" at the crime because he had known Cole. And the prosecution had asked about the juror's acquaintance with Cole: "Could that, in any way, impact your ability to be a juror?" The juror had answered: "No."

{¶ 68} Finally, defense counsel asked juror No. 9 several questions designed to elicit whether the fact that he had known the victim would affect his verdict. The juror consistently indicated that it would not. These responses were credible because juror No. 9's acquaintance with Cole was relatively distant. Martin's contention that more questions or different questions would have been more successful in revealing bias is merely speculative.

### b. Juror Who Lived Near Murder Scene

{¶ 69} Juror No. 2 lived "a couple streets" from the murder scene. She had heard about the shootings through the local "grapevine" and on the news and had discussed the incident with her husband at the time but "didn't * * * think nothing of it." She had formed no opinion about the case and recalled nothing about the news coverage or local discussion that would interfere with her impartiality. The defense asked only one question about the crime's proximity to the juror's residence.

{¶ 70} Again, Martin argues that his counsel failed to "probe" deeply enough. However, defense counsel did ask numerous questions as to whether juror No. 2 could consider the mitigating factors—the crucial issue, since the defense strategy was to concede guilt and concentrate on avoiding a death sentence—and she indicated that she could. Moreover, the prosecution had already asked the juror whether "[t]he fact that this happened a couple streets from where you live and where you raised your kids" would affect her ability to serve, and she had responded, "No." Again, any suggestion that different questions would have exposed bias on juror No. 2's part is speculative.

### 5. *Failure to Use Peremptories*

**{¶ 71}** Finally, Martin complains that his counsel did not exercise any peremptory challenges, even against four jurors whom they had unsuccessfully challenged for cause—the original juror No. 4 (not the alternate juror later seated as the replacement), and juror Nos. 6, 8, and 9. Instead, the defense and prosecution agreed that the first 12 jurors who had survived voir dire would be seated without challenge by either side. Both parties stated that they were satisfied with the jury.

**{¶ 72}** The record does not disclose why the parties came to this agreement, but it is reasonable to assume that each side got some jurors it wanted, avoided some it did not want or both. And Martin needed the vote of only one juror to avoid the death penalty, which was his primary objective in this case. *See State v. Springer*, 63 Ohio St.3d 167, 586 N.E.2d 96 (1992), syllabus (if jury cannot reach unanimous penalty-phase verdict, trial court must impose life sentence).

**{¶ 73}** "Decisions on the exercise of peremptory challenges are a part of trial strategy * * *." *State v. Goodwin*, 84 Ohio St.3d 331, 341, 703 N.E.2d 1251 (1999). These are judgment calls—subjective by nature, often based on intuition and firsthand observation by trial counsel that a reviewing court cannot replicate. Hence, it is seldom possible to find that counsel's decision to exercise or not exercise peremptory challenges falls below an objective standard of reasonable representation. *Mundt*, 115 Ohio St.3d 22, 2007-Ohio-4836, 873 N.E.2d 828, at ¶ 83; *State v. Pickens*, 141 Ohio St.3d 462, 2014-Ohio-5445, 25 N.E.3d 1023, ¶ 214, 216. Martin makes no such showing here.

### 6. *Conclusion*

**{¶ 74}** Martin's claims fail to establish ineffective assistance of counsel. In no claim has he shown that his trial counsel performed deficiently, nor has he established prejudice. We overrule his second proposition of law.

### III. SUPPRESSION ISSUES

### A. Entry of Third-Party Premises without Search Warrant

**{¶ 75}** Police officers apprehended Martin in the apartment of David Fleetwood. Officers entered the apartment to arrest him; during the entry, they recovered the murder weapon. At trial, Martin filed a motion to suppress the murder weapon as evidence. After a hearing, the trial court denied the motion.

**{¶ 76}** In his ninth proposition of law, Martin contends that the marshals' entry into the apartment violated the Fourth Amendment to the United States Constitution because, while the marshals had an *arrest* warrant for Martin, they lacked a *search* warrant authorizing them to enter and search Fleetwood's apartment. *See generally Steagald v. United States*, 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981). Hence, Martin contends, the trial court erred by denying his motion to suppress.

### 1. Waiver

**{¶ 77}** The state argues that Martin failed to preserve the issue of the allegedly illegal search because his motion to suppress did not raise it specifically enough. *See* Crim.R. 47 (requiring that a motion "state with particularity the grounds upon which it is made"); *Xenia v. Wallace*, 37 Ohio St.3d 216, 219, 524 N.E.2d 889 (1988) (defendant must give "notice of the specific legal and factual grounds upon which the validity of the search and seizure is challenged"). We disagree. Martin's motion set forth the specific "constitutional amendments [he] alleged were violated" and "set forth some underlying factual basis to warrant a hearing," *State v. Shindler*, 70 Ohio St.3d 54, 58, 636 N.E.2d 319 (1994). We note that the state did not object to the motion's supposed lack of specificity until *after* the suppression hearing. Nothing in the record indicates that the prosecution's ability "to prepare [its] case" was impaired in any way, *Wallace* at 218. Thus, we reject the state's waiver argument and proceed to the merits of Martin's claim.

### 2. *Expectation of Privacy*

**{¶ 78}** "[F]or Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." *Payton v. New York*, 445 U.S. 573, 603, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). However, an arrest warrant does not authorize police to enter the premises of a third party to arrest the subject of the warrant. For that, they must obtain a search warrant unless an exception to the warrant requirement justifies entry. *Steagald* at 211-216.

**{¶ 79}** To challenge the admission of evidence found during a warrantless search, however, a defendant must have a legitimate expectation of privacy in the premises searched. *Rakas v. Illinois*, 439 U.S. 128, 130, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), fn. 1; *Minnesota v. Carter*, 525 U.S. 83, 88, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998). In *Steagald*, the defendant seeking suppression of evidence had that expectation because the home searched was his residence. 451 U.S. at 208-211, 101 S.Ct. 1642, 68 L.Ed.2d 38. The court expressly noted that it was not deciding "whether the subject of an arrest warrant can object to the absence of a search warrant when he is apprehended in another person's home." *Id.* at 219.

**{¶ 80}** Martin here raises the question reserved in *Steagald*: whether the person named in an *arrest* warrant may object, under the Fourth Amendment, when police arrest him in another person's home after entering without a *search* warrant.

**{¶ 81}** The overwhelming majority of decisions hold that when the police enter one person's home without a search warrant in order to execute an arrest warrant upon another person, the person named in the arrest warrant may not complain of the Fourth Amendment violation. *See*, *e.g.*, *United States v. Bohannon*, 824 F.3d 242, 248-252 (2d Cir.2016), *cert. denied*, __ U.S. __, 137 S.Ct. 628, 196 L.Ed.2d 517; *United States v. Pruitt*, 458 F.3d 477, 481-482 (6th Cir.2006); *United States v. Clifford*, 664 F.2d 1090, 1092-1093 (8th Cir.1981); *United States v. Underwood*, 717 F.2d 482, 483-484 (9th Cir.1983) (en banc); *United States v.*

*Hollis*, 780 F.3d 1064, 1068-1069 (11th Cir.2015); *Commonwealth v. Tatum*, 466 Mass. 45, 50-53, 992 N.E.2d 987 (2013); *State v. deLottinville*, 890 N.W.2d 116, 119-122 (Minn.2017) (petition for certiorari filed May 19, 2017).

**{¶ 82}** Some authorities, however, take the contrary view that because a guest may have a legitimate expectation of privacy in his host's residence, he may seek to suppress evidence obtained by warrantless entry into the host's residence, even though the guest was the subject of an arrest warrant. *E.g.*, 6 LaFave, *Search and Seizure: A Treatise on the Fourth Amendment*, Section 11.3(b), at 203 (5th Ed.2012); *Underwood* at 486-492 (Skopil, J., dissenting).

**{¶ 83}** We need not choose today between these opposing views; on this record, Martin loses either way. Martin had the burden to show that he had a legitimate expectation of privacy in Fleetwood's apartment. *Rakas*, 439 U.S. at 130, 99 S.Ct. 421, 58 L.Ed.2d 387, fn. 1; 6 LaFave at 204-205. Even assuming that a guest who is the subject of an arrest warrant may challenge the lack of a warrant to search his host's residence, there was no evidence that Martin *was* a guest in Fleetwood's apartment.

**{¶ 84}** Neither Martin nor Fleetwood testified at the suppression hearing; in fact, Martin submitted no evidence at all. His presence in the apartment was "totally unexplained," *United States v. Smith*, 783 F.2d 648, 650 (6th Cir.1986). Because Martin failed to establish that he had a legitimate expectation of privacy in Fleetwood's apartment, the trial court did not err in overruling Martin's motion to suppress the murder weapon. We overrule Martin's ninth proposition of law.

### B. *Miranda* Issue

**{¶ 85}** After arresting Martin, officers did not immediately read him the *Miranda* warnings. *See generally Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Martin made incriminating statements to Deputy Marshals Boldin and Murphy at the arrest site in Tallmadge and while being transported from there to the Summit County jail in Akron. Boldin administered *Miranda* warnings

to Martin before leaving the jail. The marshals then took him to the Warren police station. On the way, Martin made further incriminating statements. At the station, Detective Mackey administered *Miranda* warnings again, obtained Martin's written waiver, and interrogated him.

{¶ 86} At trial, Martin filed a motion to suppress his statements on the ground that the arresting officers failed to administer *Miranda* warnings at the time of arrest. The trial court denied the motion. The court found that Martin's statements during the trip to Akron were "unsolicited" and "spontaneous." The court further found that Boldin advised Martin of his *Miranda* rights in Akron and that Martin "continued to offer unsolicited statements" on the ride to Warren, "as well as respond to inquiries from the transporting deputies."

{¶ 87} In his tenth proposition of law, Martin contends that the trial court should have suppressed his statements to Boldin, Murphy, and Mackey because he was not immediately advised of his *Miranda* rights at the time of his arrest. For purposes of analysis, we consider Martin's statements in three parts: his statements before being advised of his rights at or on the way to the Summit County jail, his statements while being transported from the jail to the Warren police station, and his confession at the station.

### 1. Statements between Arrest and Arrival at Summit County Jail

{¶ 88} "The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but *whether he can be interrogated*. * * * Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today." (Emphasis added.) *Miranda*, 384 U.S. at 478, 86 S.Ct. 1602, 16 L.Ed.2d 694. As a result, the requirement of *Miranda* warnings "applies only when a suspect is subjected to both custody and interrogation." *State v. Neyland*, 139 Ohio St.3d 353, 2014-Ohio-1914, 12 N.E.3d 1112, ¶ 119.

22

{¶ 89} The trial court found that the statements Martin made before he was advised of his rights were unsolicited, spontaneous, and "not in response to any inquiries of law enforcement." The record of the suppression hearing supports this finding.

{¶ 90} According to Boldin's testimony, Martin began talking at the arrest site, a mere "minute or so after" the marshals recovered the gun. Martin admitted that the gun was his, explaining that he did not want Fleetwood to get into trouble. He explained that he had placed the gun on the floor because he was afraid that he would be shot. Boldin testified that the marshals "did not ask him any questions whatsoever" except to confirm his identity.

{¶ 91} Martin was just as talkative on the way from Tallmadge to Akron. Both Boldin and Murphy testified that they did not ask him any questions during this leg of the journey. Indeed, Boldin testified that he "couldn't have questioned him about the crime if [he had] wanted to," because he knew nothing about the incident except that "it was a firearm crime" and that it took place in Warren. Instead, Boldin testified, Martin "was trying to engage us in conversation."

{¶ 92} The uncontradicted suppression-hearing testimony of Boldin and Murphy shows that they asked Martin no questions (aside from confirming his identity) before arriving at the Summit County jail. When Martin made these statements, he was in custody but he was not subjected to interrogation. Therefore, "*Miranda* does not apply." *State v. Dunn*, 131 Ohio St.3d 325, 2012-Ohio-1008, 964 N.E.2d 1037, ¶ 24.

### 2. Statements between Summit County Jail and Warren Police Station

{¶ 93} At some point, either during the trip to Akron or in the jail parking lot, Boldin advised Martin of his *Miranda* rights; Martin replied, "I've been through this before. I understand them." The trial court found no evidence to the contrary. Martin expressed his willingness to speak to the marshals. Boldin and Murphy did not obtain a written waiver because they did not have a waiver form with them.

**{¶ 94}** After Boldin gave the *Miranda* warnings, Martin made further unsolicited statements about the charged crimes on the way to Warren. He said something about him and Putnam "smoking weed" and denied the truth of certain stories that had appeared in the news media.

**{¶ 95}** At one point, Martin mentioned that his mother had been a homicide victim and claimed that he had spared Putnam's life so that her children would not grow up motherless. Boldin testified that after Martin raised the subject of his mother's death, he "did ask [Martin] some questions" about it, such as when it happened and how old he was, and that they had a "back-and-forth conversation" about it. However, Boldin did not ask any questions about the charged crimes.

**{¶ 96}** After that, all conversation ceased for at least several minutes. When they entered Warren, Martin asked the marshals whether they wanted to see "where [he had] burned [his] clothes that night." Boldin said, "Yes," and Martin gave directions to the spot.

**{¶ 97}** The unrebutted testimony at the suppression hearing shows that Martin's statements about the shootings while being transported from the Summit County jail to the Warren police station, and his offer to show the marshals where he had burned his clothing, were spontaneous and unsolicited, not the result of interrogation; as a result, the trial court did not err by declining to suppress them. *Neyland*, 139 Ohio St.3d 353, 2014-Ohio-1914, 12 N.E.3d 1112, at ¶ 119.

**{¶ 98}** Although Boldin did not ask Martin any questions about the charged crimes, he did ask about his mother's death, after Martin raised the subject. But even if the questions about the death of Martin's mother could be construed as an interrogation, those questions came only *after* Boldin administered *Miranda* warnings and after Martin waived his rights.

**{¶ 99}** In any case, Boldin's trial testimony on this matter did not prejudice Martin. At trial, it was Martin's counsel who brought up Martin's statements about his mother's homicide during Boldin's cross-examination. On redirect, Boldin

testified: "[H]e provided me with some very basic information, and I talked to him about it because I do work in Cleveland and he said it occurred in Cleveland." Neither side introduced anything further about this subject.

{¶ 100} Martin correctly argues that the state has the burden of proving a knowing, voluntary, and intelligent waiver of his *Miranda* rights. *See State v. Barker*, 149 Ohio St.3d 1, 2016-Ohio-2708, 73 N.E.3d 365, ¶ 30. He contends that the state failed to show a valid *Miranda* waiver, emphasizing that he executed no *written* waiver until arriving at the Warren police station.

{¶ 101} But a *Miranda* waiver need not be in writing to be valid. *North Carolina v. Butler*, 441 U.S. 369, 373, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979). Nor is "an explicit statement of waiver" necessary. *Id.* at 375-376. "Where the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." *Berghuis v. Thompkins*, 560 U.S. 370, 384, 130 S.Ct. 2250, 176 L.Ed.2d 1098 (2010).

{¶ 102} The state made such a showing here. When Boldin administered the *Miranda* warnings, Martin said, "I've been through this before. I understand them." The record shows that Martin's subsequent statements were uncoerced—in fact, Martin volunteered most of them. Under these circumstances, Martin validly waived his *Miranda* rights. The trial court's failure to suppress Martin's subsequent statements to the marshals was not erroneous.

### 3. Interrogation at Police Station

{¶ 103} On arriving at the Warren police station, the marshals turned Martin over to Detective Mackey, who read Martin the *Miranda* warnings. Martin executed a written waiver of his Fifth Amendment rights. Mackey then proceeded to interrogate Martin. During this interrogation, Martin confessed to shooting Cole and Putnam.

**{¶ 104}** Martin points out that he had already made unwarned statements to Boldin and Murphy before confessing to Mackey. Citing *State v. Farris*, 109 Ohio St.3d 519, 2006-Ohio-3255, 849 N.E.2d 985, he argues that "statements made after *Miranda* warnings were given which merely confirmed pre-*Miranda* statements [are] inadmissible."

**{¶ 105}** But *Farris* is inapplicable. The law-enforcement officer in *Farris* detained and questioned the suspect, and obtained an incriminating reply, *before* administering *Miranda* warnings and continuing the interrogation. *Farris* at ¶ 3-4. We characterized this as a "question-first scenario," *id*. at ¶ 19, like the interrogation in *Missouri v. Seibert*, 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004), in which five justices agreed that the postwarning statements were inadmissible, *see id.* at 617 (plurality opinion); *id.* at 618 (Kennedy, J., concurring).

**{¶ 106}** In contrast, Boldin and Murphy never interrogated Martin before administering *Miranda* warnings; they just listened to his unsolicited statements. Only *after* administering *Miranda* warnings did Boldin ask Martin any questions. This was not the "question-first scenario" of *Farris*; Martin was never subjected to custodial interrogation without *Miranda* warnings. The marshals "complied fully with the relevant constitutional requirements," *State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, ¶ 34. As a result, Martin's self-incrimination to the marshals does not affect the admissibility of his later stationhouse confession.

**{¶ 107}** The trial court did not err by denying the motion to suppress Martin's statements. We overrule Martin's tenth proposition of law.

## IV. SUFFICIENCY OF EVIDENCE ON TAMPERING CHARGE

**{¶ 108}** Martin was convicted of tampering with evidence, R.C. 2921.12(A)(1), based on his burning his clothing after the shootings. Martin never explained why he did this; when Detective Mackey asked him, he gave an unintelligible response. In his eighth proposition of law, Martin contends that the evidence was legally insufficient to convict him of tampering.

{¶ 109} In reviewing the sufficiency of the evidence to support a criminal conviction, we must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis sic.) *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

### A. Elements of Tampering with Evidence

{¶ 110} Tampering with evidence is defined as follows:

> No person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall * * * [a]lter, destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation * * *.

R.C. 2921.12(A)(1). The likelihood of an investigation is measured at the time of the alleged tampering. *State v. Straley*, 139 Ohio St.3d 339, 2014-Ohio-2139, 11 N.E.3d 1175, ¶ 19; *State v. Barry*, 145 Ohio St.3d 354, 2015-Ohio-5449, 49 N.E.3d 1248, ¶ 21.

### B. Relevance of Destroyed Evidence

{¶ 111} We have held that "the evidence tampered with must have some relevance to an ongoing or likely investigation to support a tampering charge." *Straley* at ¶ 16. Martin contends that the state failed to prove that the clothing he burned was relevant to the murder investigation.

{¶ 112} However, neither *Straley* nor R.C. 2921.12(A)(1) states that circumstantial evidence is insufficient to prove an item relevant to an investigation. "Circumstantial evidence and direct evidence inherently possess the same probative value * * *." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph one of the syllabus.

{¶ 113} The state points out that shortly before burning his clothes, Martin had shot two people at close range. From this, the state cogently argues, a jury could reasonably infer that Martin burned his clothes because he knew that his clothing contained some evidence of his crimes, such as gunshot residue or a victim's blood. Consistently with this inference, Martin went home and took a shower after burning the clothes.

{¶ 114} Moreover, after discussing the shootings with the marshals, Martin volunteered that he had burned his clothes and guided them to the pile of burned material. Evidently, Martin himself thought that his act of burning the clothes was connected to the shootings. From this evidence, the jury could reasonably infer that Martin destroyed the clothes because they were relevant to the shootings.

## C. Knowledge of Likely Investigation

{¶ 115} Martin also argues that the state did not prove that when he burned the clothing, he knew "that an official proceeding or investigation [was] in progress, or [was] about to be or likely to be instituted," R.C. 2921.12(A).

{¶ 116} As a matter of common sense, we can infer that a person who had shot two people and left them for dead in a residential neighborhood would know that an investigation was likely. Nevertheless, we recognize that "Ohio law does not impute constructive knowledge of an impending investigation based solely on the commission of an offense." *Barry*, 145 Ohio St.3d 354, 2015-Ohio-5449, 49 N.E.3d 1248, at ¶ 2.

{¶ 117} We find *Barry* distinguishable. The underlying offense in *Barry* was heroin possession, and the tampering alleged in that case was the defendant's concealment of the heroin in a body cavity. But when the defendant concealed the heroin, she had no reason to believe that the police would investigate her, for "only her coconspirators were present * * * and nothing in the record shows that she thought it likely that she would be stopped by law enforcement." *Id.* at ¶ 27. On those facts, the issue before us was "whether knowledge that an official proceeding

or investigation is pending or likely to be instituted can be imputed to one who commits a crime, regardless of whether that crime is likely to be reported to law enforcement." *Id*. at ¶ 17.

{¶ 118} But *Barry* does not foreclose the possibility that knowledge of a likely investigation may be inferred when the defendant commits a crime that *is* likely to be reported. Here, the crime was not a possessory offense; it was homicide. Homicides are highly likely to be discovered and investigated. Certainly, a jury may reasonably believe that a murderer knows this.

{¶ 119} We conclude that the evidence in this case supports the jury's finding, beyond a reasonable doubt, that when Martin burned the clothes he had worn during the shootings, he knew that "an official * * * investigation [was] * * * about to be or likely to be instituted, R.C. 2921.12(A)." We overrule Martin's eighth proposition of law.

## V. SENTENCING ISSUES

{¶ 120} In his third and fourth propositions of law, Martin argues that the circumstances of the murder were improperly used against him in the penalty phase. He argues that the trial court erroneously admitted guilt-phase evidence in the penalty phase, that the penalty-phase instructions failed to make clear what guilt-phase evidence the jury could properly consider, that the prosecution improperly cited the circumstances of the murder in its closing argument, and that the trial court improperly considered the nature and circumstances of the offense in its sentencing opinion. We consider each claim in turn.

### A. Admission of Guilt-Phase Evidence in Penalty Phase

{¶ 121} In his third proposition of law, Martin complains that the state was "permitted to proffer all evidence from the trial phase at the sentencing phase" and that this allowed the jury to consider evidence relevant to neither the aggravating circumstances nor the mitigating factors.

{¶ 122} In the penalty phase, the state offered into evidence the following exhibits that had been admitted during the guilt phase: Martin's video-recorded confession; his gun, its magazine, and the rounds test-fired from it by BCI; two shell casings found at the crime scene; the bullet removed from Cole's head during the autopsy; the bullet fragment extracted from Putnam's neck; the cords used to bind Putnam and Cole; crime-scene photographs depicting Cole's body, a shell casing on the bed, and the cord used to bind Cole's hands; Cole's death certificate; and Putnam's medical records. The trial court overruled a defense objection and admitted the exhibits.

{¶ 123} The gun, its ammunition, and the cords used to bind the victims were instrumentalities of the kidnapping and aggravated robbery and were therefore relevant to the felony-murder aggravating circumstances of which Martin was found guilty. Similarly, the photograph of Cole's body depicted the bindings on his hands and was relevant to his kidnapping.

{¶ 124} Moreover, each of the admitted exhibits, including the confession, shell casings, bullet, bullet fragments, and autopsy and medical records, showed the purposeful killing of Cole and the purposeful attempted killing of Putnam. These exhibits were therefore directly relevant to the multiple-murder aggravating circumstance, which involves the purposeful killing of or attempt to kill one or more persons. Hence, the trial court did not err by admitting them in the penalty phase. *See State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, ¶ 280 (in penalty phase, prosecutor may introduce any evidence raised at trial that is relevant to the aggravating circumstances).

## B. Penalty-Phase Instructions

{¶ 125} Also in his third proposition of law, Martin complains that the trial court's penalty-phase instructions did not clearly identify what guilt-phase evidence the jury could consider. But Martin neither objected to the penalty-phase instructions nor submitted a proposed instruction of his own. Therefore, he has

waived any error with respect to the instructions and can prevail only by demonstrating plain error. *See State v. Bethel*, 110 Ohio St.3d 416, 2006-Ohio-4853, 854 N.E.2d 150, ¶ 153.

{¶ 126} Martin claims that "[t]he jury was never instructed to disregard the evidence and testimony that did not bear upon the aggravating circumstances." This claim is factually wrong. The jury was instructed "to consider *only* the evidence admitted in the trial phase that is relevant to the aggravating circumstances of which David Martin has been found guilty and to any of the mitigating factors." (Emphasis added.)

{¶ 127} Martin also asserts that the jury was never told specifically what guilt-phase testimony had been admitted in the penalty phase. *Compare State v. Getsy*, 84 Ohio St.3d 180, 201, 702 N.E.2d 866 (1998) (trial court, not jury, is to determine what evidence is relevant in penalty phase). However, the trial court's penalty-phase instructions did not constitute plain error, because we have previously approved similar instructions.

{¶ 128} The trial court instructed the jury:

> Some of the evidence and testimony that you considered in the trial phase of this case may not be considered in the sentencing phase. For purposes of this proceeding, you are to consider only the evidence admitted in the trial phase that is relevant to the aggravating circumstances of which David Martin has been found guilty and to any of the mitigating factors.

The court then connected this instruction to the aggravating circumstances in the case:

You will consider the evidence and testimony relating to whether David Martin committed the aggravated murder of Jeremy Cole as part of a course of conduct involving * * * the purposeful killing or attempt to kill two or more persons * * *, that David Martin committed the aggravated murder * * * while he was committing or fleeing immediately after committing kidnapping * * *, that David Martin committed the aggravated murder * * * while he was committing or fleeing immediately after committing aggravated robbery * * *.

The court concluded: "You will also consider all of the evidence admitted during the sentencing phase, together with David Martin's own statement."

{¶ 129} We have held a similar instruction proper, reasoning that it "limited the jury's consideration of the guilt-phase evidence and testimony to the * * * aggravating circumstances and the mitigating factors." *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 251. Moreover, in this case, the trial court specifically identified the aggravating circumstances and instructed: "The aggravated murders themselves are not aggravating circumstances." *See also State v. Cunningham*, 105 Ohio St.3d 197, 2004-Ohio-7007, 824 N.E.2d 504, ¶ 70. Finally, the trial court "focused the jury's attention" by admitting only a limited number of guilt-phase exhibits in the penalty phase, *State v. Coley*, 93 Ohio St.3d 253, 270, 754 N.E.2d 1129 (2001).

{¶ 130} To qualify as plain error, an error must be obvious. *E.g.*, *State v. Hancock*, 108 Ohio St.3d 57, 2006-Ohio-160, 840 N.E.2d 1032, ¶ 60. Martin has not identified any obvious error in the penalty-phase instructions, which appear on their face to comport with *Lang*, *Cunningham*, and *Coley*. Accordingly, Martin's failure to object at trial forfeits any issue with respect to the instructions.

## C. State's Closing Argument

{¶ 131} Finally, Martin contends that the state made two improper statements during closing arguments in the penalty phase. First, the prosecutor argued: "Nineteen days after committing all three of these aggravating circumstances, this defendant said he could accept the needle." However, Martin did not object to this argument, so he has forfeited this claim absent a showing of plain error. *See*, *e.g.*, *State v. Thomas*, 97 Ohio St.3d 309, 2002-Ohio-6624, 779 N.E.2d 1017, ¶ 60.

{¶ 132} It was not plain error for the prosecution to cite Martin's statement that he could "accept the needle." The statement was relevant to refute the defense presentation of mitigating circumstances. In his unsworn statement, Martin apologized for his crimes and said that he would "take it back" if he could. The state could legitimately remind the jury that Martin displayed a sharply different attitude at the time of his arrest.

{¶ 133} The prosecutor also reminded the jury twice that Martin shot Cole from a distance of three to eight inches. The defense did not object to the first statement but did object to the second, so we will consider the merits of Martin's claim that this portion of the state's closing argument was improper. However, as we noted above, shooting the victim at close range shows the purposeful nature of the killing and is relevant to the course-of-conduct aggravating circumstance. This observation was not error.

{¶ 134} We overrule Martin's third proposition of law.

## D. Trial Court's Sentencing Opinion

{¶ 135} In his fourth proposition of law, Martin argues that the trial court's sentencing opinion shows that the court "improperly weighed the *facts* of the aggravated murder." (Emphasis sic.) We disagree.

{¶ 136} First, he contends that the trial court improperly referred to "the circumstances regarding the robbery and kidnapping of Putnam," which he

contends are "separate offenses" from the aggravated murder, "involving a separate victim." But it was not improper for the trial court to discuss the robbery and kidnapping of Putnam. These crimes related to the two felony-murder specifications of which Martin was convicted; the specifications arose from his commission of aggravated murder while committing kidnapping and aggravated robbery.

{¶ 137} Second, Martin complains that the sentencing opinion noted the "cold and calculated manner" in which Martin shot Cole, which he contends is a nonstatutory aggravating circumstance. However, when a trial court "correctly identifies the statutory aggravating circumstances pleaded and proven at trial, this court will infer that the trial court 'understood the difference between statutory aggravating circumstances and facts describing the nature and circumstances of the offense.' " *State v. Wiles*, 59 Ohio St.3d 71, 90, 571 N.E.2d 97 (1991), quoting *State v. Sowell*, 39 Ohio St.3d 322, 328, 530 N.E.2d 1294 (1988).

{¶ 138} Here, the sentencing opinion correctly identifies the aggravating circumstances. Therefore, we presume that the trial court understood that the cold, calculated nature of the murder was not an aggravating circumstance. *See State v. Clemons*, 82 Ohio St.3d 438, 447, 696 N.E.2d 1009 (1998) (applying presumption where sentencing opinion noted defendant's " 'calculated, cruel, willful, and cold-blooded disregard for human life' "); *State v. Moore*, 81 Ohio St.3d 22, 38, 689 N.E.2d 1 (1998).

{¶ 139} And while the cold and calculated nature of the murder is not an aggravating circumstance, the trial court could properly consider it. Since "the murder is part of the felony-murder aggravating circumstance * * *, the nature of the murder goes to the nature and circumstances of the [R.C. 2929.04](A)(7) aggravating circumstance." *State v. Campbell*, 90 Ohio St.3d 320, 345, 738 N.E.2d 1178 (2000). A court may also cite such facts "to support its finding that the aggravating circumstances outweighed the mitigating factors." *Moore* at 38, citing

*State v. Stumpf*, 32 Ohio St.3d 95, 512 N.E.2d 598 (1987), paragraph one of the syllabus. Accordingly, we overrule Martin's fourth proposition of law.

## VI. SETTLED ISSUES

{¶ 140} Martin's fifth, sixth, and seventh propositions of law raise several oft-rejected arguments, which we treat summarily. *See State v. Poindexter*, 36 Ohio St.3d 1, 520 N.E.2d 568 (1988), syllabus; *State v. Spisak*, 36 Ohio St.3d 80, 81, 521 N.E.2d 800 (1988). We overrule Martin's fifth proposition of law on the authority of *State v. Belton*, 149 Ohio St.3d 165, 2016-Ohio-1581, 74 N.E.3d 319, ¶ 88. We overrule his sixth proposition of law on the authority of *State v. Rogers*, 17 Ohio St.3d 174, 478 N.E.2d 984 (1985), paragraph three of the syllabus, *vacated on other grounds, Rogers v. Ohio*, 474 U.S. 1002, 106 S.Ct. 518, 88 L.Ed.2d 452 (1985); and *State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, ¶ 55. And we overrule his seventh proposition on the authority of *State v. Kirkland*, 140 Ohio St.3d 73, 2014-Ohio-1966, 15 N.E.3d 818, ¶ 106, 107, 109, 111, 113, 117-118, 120; *State v. Ferguson*, 108 Ohio St.3d 451, 2006-Ohio-1502, 844 N.E.2d 806, ¶ 88-90, 93; *State v. Adams*, 103 Ohio St.3d 508, 2004-Ohio-5845, 817 N.E.2d 29, ¶ 131; *State v. Scott*, 26 Ohio St.3d 92, 109, 497 N.E.2d 55 (1986); *State v. Buell*, 22 Ohio St.3d 124, 136-141, 489 N.E.2d 795 (1986); *State v. Mapes*, 19 Ohio St.3d 108, 116-117, 484 N.E.2d 140 (1985); and *State v. Jenkins*, 15 Ohio St.3d 164, 172-174, 178-179, 473 N.E.2d 264 (1984) and fn. 11.

## VII. INDEPENDENT SENTENCE EVALUATION

{¶ 141} R.C. 2929.05(A) requires that we independently review Martin's death sentence. In conducting this review, we must determine whether the evidence supports the jury's finding of aggravating circumstances, whether the aggravating circumstances outweigh the mitigating factors, and whether the death sentence is proportionate to those affirmed in similar cases.

## A. Aggravating Circumstances

{¶ 142} The jury found three aggravating circumstances: one under R.C. 2929.04(A)(5) (the offense was part of a course of conduct involving the purposeful killing of or attempt to kill two or more persons) and two under R.C. 2929.04(A)(7) (Martin committed the offense while committing aggravated robbery and kidnapping). The record supports these findings.

{¶ 143} As to the course-of-conduct specification, there is sufficient evidence to support the finding that Martin purposefully killed Cole and purposefully attempted to kill Putnam. He shot Cole in the head and attempted to shoot Putnam in the head. He shot both victims at close range while they were bound and unable to resist. And the two shootings formed a single course of conduct: both were committed with the same gun during the same robbery in the same house. *See generally State v. Sapp*, 105 Ohio St.3d 104, 2004-Ohio-7008, 822 N.E.2d 1239, ¶ 52.

{¶ 144} As to the robbery-murder specification, Putnam testified that after forcing Putnam at gunpoint to tie her own and Cole's hands, Martin removed approximately $100 from her purse, took her and Cole's cell phones, and stole some marijuana. Then, he shot her and Cole. This testimony is sufficient to prove aggravated robbery under R.C. 2911.01(A)(1) (displaying or using deadly weapon in committing theft offense) and (A)(3) (inflicting serious physical harm in committing theft offense).

{¶ 145} As to the kidnapping-murder specification, Putnam testified that during the robbery, Martin forced her to tie Cole's hands with a cord, then to tie her own, then to retie Cole to make his bonds more secure. Later, the evidence shows, Martin retied both victims himself. This is more than sufficient to prove kidnapping under R.C. 2905.01(A)(2) (restraining another's liberty to facilitate commission of felony).

**B. Mitigating Factors**

*1. Statutory Mitigating Factors, R.C. 2929.04(B)(1) through (6)*

{¶ 146} The mitigating factors set forth in R.C. 2929.04(B)(1) through (6) are inapplicable. Youth is not a factor: Martin was 28 at the time of the murder. *See State v. Frazier*, 61 Ohio St.3d 247, 258, 574 N.E.2d 483 (1991). Degree of participation is not a factor: he was the principal offender. He does not claim to lack a substantial criminal or juvenile record. There was no evidence that the victim induced or facilitated the murder, no evidence of Martin's being under duress, coercion or provocation, and no evidence of his having any mental disease or defect. (Although Martin was placed in classes for the learning-disabled at age eight, his school determined in 1997 that his bad behavior and poor attendance caused his academic problems.)

*2. Nature and Circumstances of the Offense*

{¶ 147} The nature and circumstances of the aggravated murder offer nothing in mitigation.

*3. Offender's History, Character, and Background*

{¶ 148} At the mitigation hearing, Martin made an unsworn statement and called three witnesses: Alegra Martin, Lucretia Norton, and Landon Nicholson. Alegra Martin and Norton, Martin's cousins, remembered him as a child and testified briefly about his family, but neither witness had seen much of him in recent years. Nicholson testified about Martin's youth from approximately 1996 to 2000. Martin also introduced a 586-page Cuyahoga County Division of Children and Family Services ("CFS") file on his family covering the period 1986 through 1998.

{¶ 149} Martin was born in 1984 and grew up in Cleveland. He was the youngest of the three children of Benjamin Martin Sr. and Hilda Martin.

{¶ 150} Hilda Martin was a prostitute, and both parents had drug habits (although the record is not clear as to the severity of Benjamin's habit). Benjamin and Hilda were divorced, but Benjamin subsequently moved back into the

household because he was concerned about Hilda's neglect of the children. Documents in the CFS file describe Benjamin as responsible and well organized and state that he had a good relationship with his children.

{¶ 151} The Martin family was referred to CFS for the first time in January 1986. Benjamin reported that Hilda frequently left the children alone. The assigned social worker concluded that "the referral was the result of a husband-wife dispute" and that "there appears to be no neglect of the children."

{¶ 152} A year later, the Martins were again referred to CFS. It was reported that Hilda had left the children (the oldest of whom was then seven) in the care of a friend, who had left them alone. The friend claimed that the Martins left their children alone "all the time," but Hilda denied that and the children also "denied being left alone for extended periods." The social worker found the Martin children "healthy, adequately groomed and dressed." She described the home as "generally clean and organized" with working utilities and adequate food. Nevertheless, the social worker found the children to be at risk due to "[l]ack of adequate supervision," and in February, CFS determined that the neglect allegation was substantiated.

{¶ 153} In June 1987, Hilda passed out on a downtown Cleveland street corner, in the presence of Martin (then two years old) and his brother. EMS personnel hospitalized her for intoxication and drug abuse. She was "incoherent" and had a .16 blood-alcohol content. A friend stated that Hilda abused alcohol and drugs daily. But a March 1988 "case plan" states: "The children are receiving good care in their own home" and "[p]rotective services have improved the care and supervision that these children are receiving."

{¶ 154} In 1989, when Martin was four years old, Hilda was murdered. The CFS file shows that Martin and his siblings received no counseling to help them deal with their mother's death, at least up to October 1997.

{¶ 155} After the murder, Benjamin and his children moved to the Morris Black housing project. Witnesses described Morris Black as a rough and dangerous area on Cleveland's east side. According to Nicholson, fights and shootings were everyday occurrences during the "cocaine era" that had begun in the mid-1980s.

{¶ 156} In 1992, CFS closed the Martin case because "the neglect allegations were against the mother [and] not the father," there had been no new referrals in two years, and the family's whereabouts were unknown.

{¶ 157} From 1993 to 1997, the Martin household was referred to CFS five times for alleged child abuse and/or neglect. However, after investigating each allegation, CFS found no evidence of abuse or neglect.

{¶ 158} Yet the CFS file suggests that Benjamin had considerable difficulty raising his children. A 1995 report states that Benjamin had "followed thru on recommendations" and was "well bonded" with his children yet Martin's siblings were "beginning to exhibit unruly behaviors." A report later in 1995 describes Martin himself as "unruly [and] delinquent." The CFS file speaks of "gang violence," "peer pressure," and a community with "areas * * * undesirable for [the] youth's well being." Martin was frequently suspended from school, often without telling Benjamin. He was expelled in March 1997 and not readmitted until October.

{¶ 159} In 1997, Martin's brother was stabbed. One month later, a CFS social worker noted that Benjamin appeared "frustrated and helpless." A few months later, another report described him as "overwhelmed" and stated that he "has given up." Benjamin was dealing with physical- and mental-health issues around the same time: he had been diagnosed as HIV-positive, was frequently hospitalized, and had made three suicide attempts.

{¶ 160} In October 1997, Martin, then 13, was charged with assault and marijuana possession. His father failed to attend a court hearing with him, prompting the judge to call for another investigation. The social worker initially determined that neglect was "[i]ndicated" and that Martin was at

"[m]oderate/[h]igh risk." However, in June 1998, CFS determined that there was no abuse or neglect "at this time."

{¶ 161} In the Morris Black project, Martin was exposed to bad influences. Landon Nicholson testified that he first met Martin in 1996, when Martin was 11 or 12, and knew him until Martin was incarcerated (the record does not show why) in 2000. Nicholson testified that Martin "belonged to the streets"; he often saw Martin without supervision, "roaming through the projects" at all hours. According to Nicholson, Martin's father was "high all the time," spent his time in crack houses, and exerted no positive influence.

{¶ 162} Nicholson recalled that Donald Ray, a local gangster who owned a boxing gym—and who was later convicted of murder—taught Martin and other neighborhood children to box. While Nicholson claimed to have "looked out for [Martin] and his brother," he conceded that neither he nor Ray were "role models." He and Ray openly engaged in wrongful activities, and "it wasn't like [the local children] couldn't see what we was doing."

### 4. Remorse and Cooperation with Law Enforcement

{¶ 163} After his arrest, Martin accepted responsibility for the shootings and cooperated with law enforcement. He spoke freely to Deputy Marshals Boldin and Murphy, voluntarily led them to where he had burned his clothing, and confessed to Detective Mackey.

{¶ 164} Martin also expressed remorse in the brief unsworn statement that he read in the penalty phase. He apologized to Cole's family and to Putnam, and he asked for forgiveness. He said that "[d]rugs was a big part of what led to the incident." He urged others to "learn from the wrong that I have done and stop the violence and drugs because it's hurtin' more than it's helping."

### C. Sentence Evaluation

{¶ 165} Martin's history, character, and background are not devoid of mitigation. While he was not abused, his upbringing was deficient in important

ways. The CFS file suggests that his father was a caring parent who tried to provide love and discipline yet was unable to teach his children to behave. The file indicates that at some point in Martin's teenage years, his father virtually gave up and consigned him to the influence of the streets. Moreover, Martin lost his mother at an early age and received little or no help dealing with that issue. Even so, we have "seldom accorded strong weight to a defendant's childhood," *State v. Murphy*, 91 Ohio St.3d 516, 547, 747 N.E.2d 765 (2001), even in cases in which the defendant had suffered severe abuse, *see, e.g.*, *State v. Holloway*, 38 Ohio St.3d 239, 245-247, 527 N.E.2d 831 (1988); *State v. Cooey*, 46 Ohio St.3d 20, 41, 544 N.E.2d 895 (1989); *State v. Murphy*, 65 Ohio St.3d 554, 585-586, 605 N.E.2d 884 (1992).

**{¶ 166}** The tepid expression of remorse in Martin's unsworn statement deserves little weight. On the other hand, his cooperation with law enforcement is entitled to some weight. *See*, *e.g*., *State v. Elmore*, 111 Ohio St.3d 515, 2006-Ohio-6207, 857 N.E.2d 547, ¶ 166; *Bethel*, 110 Ohio St.3d 416, 2006-Ohio-4853, 854 N.E.2d 150, at ¶ 191.

**{¶ 167}** In assessing that weight, however, we are constrained to observe that Martin was not completely honest with Detective Mackey. He denied that he intended to kill Putnam, despite having fired at her head from close range. He also denied personally tying up either victim, but Putnam testified that he tied her hands and the evidence shows that he also tied Cole's. Putnam tied Cole's hands with a phone cord, but when police found Cole's body, the hands were bound with the cord from Putnam's alarm clock. It follows that Martin must have retied them. His attempts to mislead the police and minimize his guilt reduce the weight that his voluntary cooperation would otherwise merit.

**{¶ 168}** At best, Martin's mitigating factors deserve modest weight. We find that the three aggravating circumstances, especially the course-of-conduct circumstance, outweigh the mitigating factors beyond a reasonable doubt.

{¶ 169} Finally, we find that Martin's death sentence is not disproportionate to the penalty imposed in similar cases. *See* R.C. 2929.05(A). We have approved death sentences in cases combining a robbery-murder specification with a course-of-conduct specification involving one murder and one attempted murder. *State v. Perez*, 124 Ohio St.3d 122, 2009-Ohio-6179, 920 N.E.2d 104, ¶ 253-254; *State v. Dennis*, 79 Ohio St.3d 421, 439, 683 N.E.2d 1096 (1997); *see also State v. Beuke*, 38 Ohio St.3d 29, 45, 526 N.E.2d 274 (1988) (robbery-murder and course of conduct consisting of one murder and two attempted murders). We have approved a death sentence in a case with the sole death-penalty specification of course of conduct involving one murder and one attempted murder. *Sowell*, 39 Ohio St.3d at 337, 530 N.E.2d 1294. We have also approved death sentences in cases involving only a robbery-murder specification, *e.g.*, *Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, at ¶ 278; *State v. Lindsey*, 87 Ohio St.3d 479, 492, 721 N.E.2d 995 (2000); *State v. Post*, 32 Ohio St.3d 380, 395, 513 N.E.2d 754 (1987) and fn. 10, and in cases involving only a kidnapping-murder specification, *e.g.*, *State v. Hartman*, 93 Ohio St.3d 274, 305-306, 754 N.E.2d 1150 (2001); *State v. Ballew*, 76 Ohio St.3d 244, 257-258, 667 N.E.2d 369 (1996); *State v. Joseph*, 73 Ohio St.3d 450, 462-463, 653 N.E.2d 285 (1995).

## VIII. CONCLUSION

{¶ 170} We affirm the judgments of conviction and the sentence of death.

Judgment affirmed.

O'CONNOR, C.J., and O'DONNELL, KENNEDY, FISCHER, and DEWINE, JJ., concur.

O'NEILL, J., concurs in part and dissents in part, for the reasons set forth in his dissenting opinion in *State v. Wogenstahl*, 134 Ohio St.3d 1437, 2013-Ohio-164, 981 N.E.3d 900.

_____

Dennis Watkins, Trumbull County Prosecuting Attorney, and Christopher D. Becker and LuWayne Annos, Assistant Prosecuting Attorneys, for appellee.

John B. Juhasz; and Maro & Schoenike Co. and Lynn A. Maro, for appellant.

_____