[Cite as *State v. Bennett*, 2023-Ohio-2734.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
ROSS COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| | : | Case No. 21CA3751 |
| Plaintiff-Appellee, | : | |
| | : | |
| v. | : | DECISION AND JUDGMENT ENTRY |
| | : | |
| JACOB A. BENNETT, | : | |
| | : | |
| Defendant-Appellant. | : | **RELEASED: 08/02/2023** |

APPEARANCES:

April F. Campbell, Delaware, Ohio, for appellant.

Jeffrey C. Marks, Ross County Prosecuting Attorney, and Pamela C. Wells, Assistant Ross County Prosecutor, Chillicothe, Ohio, for appellee.

Wilkin, J.

{¶1} This is an appeal from a Ross County Court of Common Pleas judgment of conviction in which the jury found appellant, Jacob A. Bennett, guilty of rape, a first-degree felony. The trial court imposed a minimum prison term of 7 years and a maximum prison term of 10.5 years. Bennett challenges his conviction on several grounds.

{¶2} First, Bennett argues the trial court abused its discretion when it overruled his objection to the admission of evidence he claims was hearsay. During the state's case, J.W., the victim's mother, testified. During J.W.'s testimony, she explained that when her daughter I.W. returned from an overnight visit at Bennett's parents' house, I.W. was not acting like herself. I.W. was quiet and not interacting. This prompted J.W. to question I.W. as to what happened.

In response to one of J.W.'s questions, I.W. responded affirmatively that "something" happened and Bennett was the one who did it.  We find no abuse of discretion in admitting I.W.'s response since it was properly admitted as an excited utterance, an exception to hearsay.

{¶3} Second, Bennett argues his trial counsel was ineffective for failing to object to several hearsay statements that were admitted.  Bennett's claims fail.  First, Sergeant Kocheran's testimony was not hearsay since it was not admitted for the truth of the matter asserted.  The sergeant testified that the victim's mother called to inquire on what to do after she was informed by I.W. that I.W. was sexually assaulted.  The Sergeant did not speak to the details of the alleged offense or even identify Bennett.  He merely testified to the steps he took of initiating a complaint and forwarding it to another division.

{¶4} Within the second assignment of error, Bennett also asserts that J.W.'s testimony about visiting two hospitals and that a sexual assault examination was not completed, should have been objected to by his counsel.  Bennett maintains the failure to object prejudiced him.  We disagree and conclude that Bennett cannot demonstrate prejudice from the admission of this testimony.  The lack of completing a sexual assault examination did not affect the outcome of the trial.  Finally, Bennett maintains that his counsel should have objected to J.W.'s testimony regarding Bennett's mother's statement that Bennett did not deny the assault.  We conclude Bennett fails to establish prejudice because the state's evidence included a direct admission by Bennett of forcefully assaulting I.W.

{¶5} In the third assignment of error, Bennett asserts the conviction should be reversed because the state failed to demonstrate by the sufficiency and manifest weight of the evidence that he forced I.W. to have intercourse with him. Bennett maintains that the sexual conduct was consensual. We disagree. I.W. testified that Bennett pulled her hair, pushed her toward the wall and caused her to fall on her knee, forcefully grabbed her chest area leaving two bruises, pulled her shorts down, and had intercourse with her after she told him to stop and was crying. Additionally, after the sexual assault, Bennett in his text messages to I.W. admitted to forcefully having intercourse with her. Accordingly, there was sufficient evidence supporting Bennett's conviction and the jury did not lose its way by believing I.W.'s testimony and finding Bennett guilty of rape.

FACTS AND PROCEDURAL BACKGROUND

{¶6} In November 2020, Bennett was indicted with one count of rape, a first-degree felony, based on his sexual assault of I.W. that occurred between July 21 and July 22, 2020. The charge was a first-degree felony because the state alleged that Bennett engaged in sexual conduct with I.W. by "purposely compel[ing] the said other person to submit by force or threat of force[.]" At the time of the assault, I.W. was 17 years old and Bennett was 25 years old.

{¶7} Bennett and I.W. knew each other for many years. I.W. was eight years old when her family began attending the same church services as Bennett's family. Over the years, the families spent more time together and became close. Because of the age gap of eight years between I.W. and Bennett, I.W. was not close to him as much as his younger sister, S.B. who is one year

older than I.W., and Bennett's younger brother, N.B. who is three years older than I.W.

{¶8} As the families got to know each other more, it was common for I.W. and her older sister, A.W., to spend the night at Bennett's parents' house. During those stays, Bennett was usually not at the house as he lives across the street with his wife and two children. Up until January 2020, I.W.'s interaction with Bennett was limited and usually in the presence of his wife. But after January 2020, Bennett began messaging I.W. through Instagram and their contact was more frequent. I.W. and Bennett would message each other privately every couple of weeks, exchanging general conversation and discussing their respective jobs. As July 2020 approached, the messaging increased to a couple of times a week. The frequency was not the only shift in their communication, the content became more friendly.

{¶9} In July 2020, I.W. spent two separate nights on two different dates at Bennett's parents' house. The first overnight stay was the week of July 14th. The second overnight was July 21, 2020. Both stays were for the purpose of helping Bennett's parents set up a chicken coop. The overnight visit of July 21 began with Bennett picking up I.W. and her sister A.W. from their home and driving them to his parents' house that is over an hour away.

{¶10} The night of July 21, I.W., Bennett and the other young adults were playing hide-and-seek tag in the dark. Before playing, I.W. changed into dark-colored clothing, a pair of shorts Bennett gave her to wear, since she was wearing a light-colored pair of jeans. During the game, I.W. was paired with

Bennett, A.W. and S.B. were a team, and finally N.B. and his girlfriend were a team. They stopped playing around 10:30 p.m. when S.B. and A.W. ended up in a poison ivy patch. S.B. and A.W. went inside Bennett's parents' house and N.B. left to take his girlfriend back home. Bennett and I.W. stayed outside initially sitting behind his parents' house on the swing.

{¶11} During their time alone, Bennett told I.W. that she was beautiful and about 45 minutes later when they began heading to his parents' house, Bennett offered to continue hanging out at his house. Bennett began kissing I.W. and she told him they should go back inside his parents' house. Bennett did not want to go back inside and suggested they stay outside a bit longer. They started walking with Bennett pulling I.W. by the arm and directing her away from his parents' house. I.W. "felt slightly uncomfortable, I didn't think that anything was going to happen. I trusted him enough to know that I was safe."

{¶12} Bennett "ended up starting to make more moves[,]" and getting "more touchy feely and just, you know, more on the compliment side." Bennett's behavior escalated with I.W. testifying that his behavior got more aggressive and the "aggression is really what caught me off guard because I never expected him to be the aggressive type." I.W. told Bennett several times that they should go back inside, and he would gesture no and to stay outside.

{¶13} I.W. and Bennett were walking around wandering and ended up behind his house at the barn area. There, Bennett touched I.W. in other places including her chest area "hard enough to leave bruises." Bennett then touched the lower part of I.W.'s body and was touching her everywhere. At one point,

I.W. thought Bennett was stopping and they were going back inside his parents' house, but then he pulled her hair with his hand and pulled down her shorts. I.W. told him "we should quit and go and that I didn't want to do it." Bennett did not stop and continued to feel I.W.'s body with his hand and as she faced the barn, he pushed her against the wall and she lost her balance and hit her knee. I.W. again told him they should go back inside and reminded him that he was married.

{¶14} I.W. told Bennett she did not want to do it and was crying. Bennett disregarded her request and grabbed her by the hips and positioned himself behind her, had intercourse with her and ejaculated behind her with some of it getting on her clothing. I.W. was in shock. I.W. pulled her shorts up and told him she was going inside. Bennett almost immediately began apologizing. I.W. went back to his parents' house and took a shower.

{¶15} Shortly after laying down on the couch at his parents' house, at approximately 3:30 a.m., Bennett began messaging I.W. Bennett apologized and when I.W. asked what was he apologizing for, he responded:

> Forcing myself onto you. Doing that at all. I was trying so hard not to be a sex obsessed asshole to you[.] * * * I'm sorry. I'm sorry I did it, and I'm sorry I liked it so much[.]

> * * * I basically raped you. I... I'm so sorry. I shouldn't have done it[.]

{¶16} When interviewed by Detective Martin Brooks on August 21, 2020, Bennett claimed that I.W. initiated the sexual encounter in which she lifted her shirt up and rubbed her chest against his body. Bennett continued that it was I.W. who groped him, pulled her pants down, bent over, and pulled him closer to her. Further, he stated that he and I.W. had a previous sexual encounter about a

week prior and she performed oral acts on him, but they had agreed that it would not happen again. Bennett recounted that on July 21, at approximately 1:30 a.m., while sitting on his back porch, he invited I.W. and they talked and agreed that nothing would happen. I.W., however, made advances and they ended up having consensual intercourse. Bennett told the detective that it was "absolutely" consensual intercourse. In explaining his text messages, Bennett informed Detective Brooks that he vaguely remembers sending the messages and that he was distressed that night and "was scared and emotionally wrecked because I didn't want it to happen."

{¶17} Bennett requested a second interview with Detective Brooks and it occurred on September 10, 2020. Bennett provided Detective Brooks with additional information including that earlier in the night on July 21, he and I.W. were in the barn when I.W. pulled down her pants, he pulled down his pants, and they were about to have intercourse, but then I.W. turned around, got dressed and said "later." The day after, I.W. messaged him and said we have a problem because her boyfriend got a hold of her phone and saw the message exchanges between them. I.W.'s boyfriend took screenshots of the messages and sent them to her mother. Bennett told the detective that he deleted this message exchange between him and I.W. and he wished he did not.

{¶18} The jury heard I.W.'s testimony directly and heard Bennett's version of the events through the audio recording of his interviews with Detective Brooks who testified at trial. In addition, the state called Sergeant Eric Kocheran who took the initial complaint, Brittany Carpenter who conducted I.W.'s forensic

interview at children protective services, and J.W.—I.W.'s mother.  The state's 32

exhibits were admitted without objection which included the text message

exchange between Bennett and I.W. after the sexual assault, photos of I.W.'s

bruises, and the two audio recordings of Bennett's interviews with Detective

Brooks.  Bennett rested his case without presenting any evidence.  After

deliberation, the jury found Bennett guilty of rape as charged.

{¶19} The trial court conducted a sentencing hearing in which Bennett

elected not to address the court.  I.W.'s victim impact statement was read at the

hearing.  After considering all the applicable sentencing provisions, the trial court

imposed a minimum prison term of 7 years and a maximum prison term of 10.5

years.  It is that judgment of conviction that is before us for review.

ASSIGNMENTS OF ERROR

I.      THE TRIAL COURT ERRED TO BENNETT'S PREJUDICE WHEN
        IT REFUSED TO EXCLUDE THE HEARSAY STATEMENT OF
        THE VICTIM BOTH IDENTIFYING BENNETT AS THE SUSPECT
        AND ACCUSING BENNETT OF THIS CRIME, MADE THROUGH
        HER MOTHER'S TESTIMONY.

II.     BENNETT'S CONVICTION SHOULD BE REVERSED BECAUSE
        HIS TRIAL COUNSEL WAS INEFFECTIVE IN A MANNER THAT
        PREJUDICED BENNETT.

III.    THE STATE'S EVIDENCE THAT BENNETT COMMITTED
        FORCIBLE RAPE WAS LEGALLY INSUFFICIENT AS A MATTER
        OF LAW. THE EVIDENCE ALSO WEIGHED MANIFESTLY
        AGAINST CONVICTING BENNETT.

ASSIGNMENT OF ERROR I

**{¶20}** Bennett argues the trial court abused its discretion when it admitted hearsay testimony over Bennett's objection of the victim's statement to her mother identifying Bennett as the person who did "something" to her. Bennett maintains that the statement was not made under stress or excitement. Therefore, it does not fall under the excited utterance exception, and no other hearsay exception applies. Accordingly, it was prejudicial to admit the response warranting reversal of his conviction regardless that I.W. testified at trial.

**{¶21}** The state disagrees and asserts that I.W.'s statement to her mother in which she identified Bennett falls under the excited utterance hearsay exception. The state contends that when I.W. made the statement to her mother, she was still under the stress of being sexually assaulted and the fact that it was in response to a question did not remove it from the hearsay exception. Further, the state contends that if this court finds the trial court improperly admitted I.W.'s response identifying Bennett, the admission is harmless in light of the overwhelming evidence that includes I.W.'s trial testimony and Bennett's admission to committing the crime.

**{¶22}** Bennett responds that I.W. waited 24 hours before informing her mother that "something" happened and identified Bennett. Additionally, I.W. took a shower after having intercourse with Bennett and only revealed his identity after her boyfriend encouraged her to speak up. This, according to Bennett, demonstrates that the statement does not fall under the excited utterance exception.

Law and Analysis

{¶23} During trial, the state called J.W., who is I.W.'s mother, as its third witness prior to I.W.'s testimony.  J.W. began her testimony explaining how I.W. and her sister A.W. were homeschooled since completing third and fourth grade, respectively.  I.W. and A.W.'s social activities were limited with the majority revolving around religious activities including attending home church on Sabbath days, biblical holidays and feast days with other members of the church.  J.W. stated that they met Bennett's family back in 2011 when they attended the same church service.  As the families became close, it was common for I.W. to spend time with Bennett's family including overnight stays.

{¶24} On July 21, 2020, Bennett and his brother N.B. came and picked up I.W. and A.W.  The plan was for I.W. and A.W. to spend one night at Bennett's parents' house.  Per the plan, on July 22, 2020, I.W. and A.W. returned home. After returning home, I.W. was not talking, was withdrawn and J.W. could tell something was wrong.  Because of the change that J.W. noticed of her daughter, she continued to question I.W. about what was wrong.  I.W. continued to be withdrawn and finally responded to the following: "So, I just said, I kept asking her. Did somebody do something. She said yes, I asked who, she said Jacob[.]" Bennett's counsel objected to the statement as being hearsay.  The trial court overruled the objection without any analysis.

{¶25} Bennett and the state concede that the statement is hearsay but disagree on the application of the excited utterance hearsay exception.  Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted in the

statement." Evid.R. 801(C).  We agree that the statement was hearsay.  First, it was a statement made by I.W., not the declarant.  Second, it was offered for the truth of the matter asserted in which right after the trial court overruled Bennett's objection, the state questioned J.W.: "So, at that point, she had acknowledged Jacob[,]" to which J.W. responded: "Yes."  The state's questioning reflects the admission of the statement for the truth of the matter asserted; i.e., Bennett did something to I.W.

> Hearsay is not admissible except as otherwise provided by the Constitution of the United States, by the Constitution of the State of Ohio, by statute enacted by the General Assembly not in conflict with a rule of the Supreme Court of Ohio, by these rules, or by other rules prescribed by the Supreme Court of Ohio.

Evid.R. 802.

{¶26} The statement, therefore, was inadmissible unless one of the exceptions applied.  Excited utterance is such an exception and is defined as: "a statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."  Evid.R. 803(2). The rationale of the exception "is that circumstances surrounding the excited statement prevent the declarant from using reflective processes to fabricate a statement."  *State v. Felts*, 4th Dist. Ross No. 15CA3491, 2016-Ohio-2755, ¶ 53.

> A four-part test is administered to determine the admissibility of statements as an excited utterance: (1) a startling event, (2) a statement relating to that event, (3) a statement made by a declarant with firsthand knowledge, and (4) a statement made while the declarant was under the stress of the excitement caused by the event.

*State v. Dean*, 146 Ohio St.3d 106, 2015-Ohio-4347, 54 N.E.3d 80, ¶ 123.

**{¶27}** Generally, "[t]he admission or exclusion of relevant evidence rests within the sound discretion of the trial court." *State v. Sage*, 31 Ohio St.3d 173, 51 N.E.2d 343 (1987), paragraph two of the syllabus. Accordingly, "we review a trial court's hearsay rulings for an abuse of discretion." *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, ¶ 97. An abuse of discretion "is more than a mere error of law or judgment; it implies that a trial court's decision was unreasonable, arbitrary or unconscionable." *State v. Martin*, 151 Ohio St.3d 470, 2017-Ohio-7556, 90 N.E.3d 857, ¶ 27, citing *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

**{¶28}** We find no abuse of discretion in the case at bar. I.W. returned home after being sexually assaulted by Bennett, which is a startling event. Second, her response that "something" happened and it was Bennett related to the assault. Contrary to Bennett's assertion, the fact that I.W. made the statement "in response to her mother's questions did not render the statement inadmissible under excited-utterance exception." *Felts*, 2016-Ohio-2755, ¶ 59. Third, the response was made by I.W., the victim who had first-hand knowledge of the assault.

**{¶29}** Finally, we conclude that I.W. made the statement while still under the stress of the excitement caused by the assault. As we previously recognized:

> "children are likely to remain in a state of nervous excitement longer than would an adult in cases involving hearsay statements by a child declarant." *Id.* Consequently, courts have upheld the application of the excited-utterance exception even where several days or weeks have elapsed since the startling event. *See State v. Wilson,* 4th Dist. Scioto No. 13CA3542, 2015-Ohio-2016, 2015 WL 3384507, ¶ 90, and cases cited there, including *In re C.C.,* 8th Dist. Cuyahoga Nos. 88320 and 88321, 2007-Ohio-2226, 2007 WL 1366431, ¶

53 (concluding that children's statements made 27 days after incident qualified as excited utterances).

Other relevant factors generally indicating whether the declarant was in a sufficient state of excitement or stress when making the statement include outward indicia of emotional state, like tone of voice, accompanying actions, and general demeanor. *See, generally, State v. F.R.,* 2015-Ohio-1914, 34 N.E.3d 498, ¶ 28, (10th Dist.) and cases cited there.

*Felts*, 4th Dist. Ross No. 15CA3491, 2016-Ohio-2755, ¶ 56-57.

**{¶30}** I.W. was 17 years old when she was assaulted by 25-year-old Bennett, a family friend she has known since she was 8 years old. On July 22, around lunchtime when I.W. returned home from her overnight stay at Bennett's parents' house, J.W. immediately "knew there was something wrong." This is because I.W. was not talking and was withdrawn. J.W. knew her daughter not simply due to their mother-daughter relationship, but further because she has homeschooled I.W. since she was nine years old. Because J.W. knew her child, she continued to question I.W. who finally responded the evening she returned home that something happened and Bennett did it. Thus, I.W. disclosed something occurred within approximately 18 hours of the sexual assault, which under the circumstances of the case, is within a timeframe that I.W. would still be under a state of nervous excitement.

**{¶31}** Wherefore, we conclude that I.W.'s response through the testimony of J.W. was properly admitted as an excited utterance exception to the hearsay rule.

**{¶32}** Bennett in support of his argument for reversal, cites to the Tenth District Court of Appeals' decision in *State v. Zimmerman*, 2019-Ohio-721, 132 N.E.3d 1185 (10th Dist.). We decline to follow the holding in *Zimmerman* and

reverse Bennett's conviction as the case is factually distinguishable from this case. In *Zimmerman*, numerous testimonies by officers were admitted regarding the victim's detailed recounting of the kidnapping even after the trial court cut off the testimony as being improper hearsay. *Id.* at ¶ 30. Moreover, one of the officers testified that he found the victim to be "honest," and another officer was permitted over objection to testify that "he believed" the victim, thus, bolstering the victim's character. *Id.* at ¶ 28-29, 32.

{¶33} Here, on the other hand, J.W. in two short responses to the state's questioning testified that I.W. confirmed that "something" happened and it was Bennett who did it. J.W. did not provide any further detail of the sexual assault. Additionally, J.W. did not make a statement as to I.W.'s character and credibility. Moreover, in *Zimmerman* the Tenth District reversed the kidnapping conviction not solely on the basis of the improper admission of hearsay testimony, but rather due to several errors that are not present here:

> The trial court committed error when it allowed improper testimony by police officers that was admittedly offered to bolster Ward's credibility. Likewise, the trial court erred by failing to grant Zimmerman a new trial based on a direct admission that the jury was exposed to, and spent at least some time considering in its deliberations an excluded and salient piece of evidence, the photo of Zimmerman's knife, for which admission had been denied by the trial court. The individual prejudicial effect of each these errors was significant and, when considered in context of the rest of the evidence adduced at trial, the collective or cumulative effect of these issues deprived Zimmerman of a fair trial.

*Zimmerman* at ¶ 34.

{¶34} Accordingly, we overrule Bennett's first assignment of error.[1]

ASSIGNMENT OF ERROR II

{¶35} In the second assignment of error, Bennett argues his trial counsel was ineffective for failing to object to three hearsay statements that he maintains were highly prejudicial. The first statement that his counsel should have objected to as being hearsay occurred during Sergeant Kocheran's testimony in which he disclosed that I.W.'s mother contacted him asking for advice on how to proceed after I.W. disclosed what occurred. During his testimony, Sergeant Kocheran stated that according to I.W.'s mother, she took I.W. to two hospitals but a sexual assault nurse examination ("SANE") was not conducted. Bennett maintains this statement was admitted for the truth of the matter asserted and was prejudicial since no medical personnel testified.

{¶36} The next two statements that Bennett claims should have been objected to were made during J.W.'s testimony. J.W. testified regarding her phone conversation with Bennett's mother in which Bennett's mother stated that Bennett did not deny sexually assaulting I.W. Bennett argues the admission of this statement was highly prejudicial to his defense of a consensual sexual encounter with I.W. Similarly, Bennett avers that trial counsel was ineffective and it was not trial strategy to not object to J.W.'s testimony of hospital administrators

---

[1] Bennett as part of his argument asserts that the harmless error doctrine cannot be applied if we conclude that I.W.'s response was improperly admitted. We reject this argument and would uphold Bennett's conviction even if the admission of I.W.'s response was improper since the error would be harmless in light of I.W.'s direct testimony at trial regarding Bennett's sexual assault. *See State v. Beasley*, 153 Ohio St.3d 497, 2018-Ohio-493, 108 N.E.3d 1028, ¶ 176 ("Portions of Vickery's testimony, specifically, when he recounted information relayed to him by Scott Davis, did not appear to clearly connect to any subsequent investigatory steps. However, because Davis had already testified to the same information, the error was harmless.")

informing her that a sexual assault examination would be performed on I.W.

Therefore, Bennett maintains that the inadmissible evidence connected him to

the crime and amounted to an admission to the sexual assault.  This was

damaging to him as it was completely contradictory to his defense of a

consensual encounter.

{¶37} The state disagrees with Bennett's characterization of Sergeant

Kocheran's testimony as being admitted for the truth of the matter asserted.  The

state argues that the statement was properly admitted to explain the progression

of the investigation, thus, an objection would not have been sustained.  The state

similarly argues that J.W.'s statement of what Bennett's mother disclosed was

similarly not admitted for the truth of the matter asserted. The state maintains

that the admission of the three statements did not prejudice Bennett since

Bennett's lack of denial of sexually assaulting I.W. was cumulative to the direct

evidence of his own admission of raping I.W.  Moreover, the state did not use the

statements to prove Bennett's guilt.  Finally, the state asserts that Bennett fails to

identify what is prejudicial of the statements regarding the failure to complete a

sexual assault examination.

{¶38} In response, Bennett declares he demonstrated prejudice because

the double hearsay of Bennett's mother that Bennett is not denying the sexual

assault was damaging to his defense.  Bennett asserts his counsel failed to

object to this admission and it cannot be argued that it was trial strategy.

Law and Analysis

**{¶39}** To demonstrate ineffective assistance of counsel, Bennett "must show (1) deficient performance by counsel, i.e., performance falling below an objective standard of reasonable representation, and (2) prejudice, i.e., a reasonable probability that, but for counsel's errors, the proceeding's result would have been different." *State v. Short*, 129 Ohio St.3d 360, 2011-Ohio-3641, 952 N.E.2d 1121, ¶ 113, citing *Strickland v. Washington*, 466 U.S. 668, 687-688, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1988), paragraph two of the syllabus. Failure to demonstrate either prong of this test "is fatal to the claim." *State v. Jones,* 4th Dist. Scioto No. 06CA3116, 2008-Ohio-968, ¶ 14, citing *Strickland*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674.

**{¶40}** Bennett "has the burden of proof because in Ohio, a properly licensed attorney is presumed competent." *State v. Gondor*, 112 Ohio St.3d 377, 2006-Ohio-6679, 860 N.E.2d 77, ¶ 62, citing *State v. Calhoun*, 86 Ohio St.3d 279, 289, 714 N.E.2d 905 (1999), citing *Vaughn v. Maxwell*, 2 Ohio St.2d 299, 209 N.E.2d 164 (1965). "In order to overcome this presumption, the petitioner must submit sufficient operative facts or evidentiary documents that demonstrate that the petitioner was prejudiced by the ineffective assistance." *Id.*, citing *State v. Davis*, 133 Ohio App.3d 511, 513, 728 N.E.2d 1111 (8th Dist.1999). To demonstrate prejudice, Bennett "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would

have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland* at 694.

{¶41} Moreover, "the failure to make objections is not alone enough to sustain a claim of ineffective assistance of counsel." *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 103, citing *State v. Holloway*, 38 Ohio St.3d 239, 527 N.E.2d 831 (1988). The defendant must also show that the failure to object affected the outcome of the trial. *Id.* at ¶ 104.

### A. Sergeant Kocheran's Testimony

{¶42} The state's first witness was Sergeant Kocheran. During his shift on July 23, 2020, he was contacted via phone by J.W. who called because:

> She wanted to basically seek some advice. She believed that her daughter had been a victim of a rape over the weekend and that she wanted to know what her options were as far as investigations and seeking help for her daughter.

{¶43} He advised J.W. to take her daughter "to the hospital, have a SANE kit, a SANE examination kit done and that she probably should provide me with the information of the alleged offender." At this time, J.W. did not provide the name of the offender and only gave Sergeant Kocheran I.W.'s information. None of the above referenced testimony was objected to by Bennett's counsel and Sergeant Kocheran continued on how he proceeded after receiving J.W.'s phone call. He completed a report and forwarded the information to the patrol captain who requested for the sergeant to forward the information to another division.

{¶44} Bennet maintains that the above testimony was hearsay and his counsel should have objected to it as it prejudiced his theory of consensual

intercourse.[2] We disagree. Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted in the statement." Evid.R. 801(C).

> Testimony to explain police conduct is admissible as nonhearsay if it satisfies three criteria: (1) the conduct to be explained is relevant, equivocal, and contemporaneous with the statements, (2) the probative value of the statements is not substantially outweighed by the danger of unfair prejudice, and (3) the statements do not connect the accused with the crime charged.

*State v. Beasley*, 153 Ohio St.3d 497, 2018-Ohio-493, 108 N.E.3d 1028, ¶ 172, citing *State v. Ricks*, 136 Ohio St.3d 356, 2013-Ohio-3712, 995 N.E.2d 1181, ¶ 27.

**{¶45}** The above brief statements by Sergeant Kocheran were not admitted for the truth of the matter asserted. Rather, they were offered for the nonhearsay purpose of explaining how the investigation began. *Id.* The statements explained why the sergeant completed a report and then forwarded it to another division. Therefore, we find that the testimony did not meet the definition of hearsay. Further, the probative value of explaining the investigation process was not outweighed by the danger of unfair prejudice.

> " 'Exclusion on the basis of unfair prejudice involves more than a balance of mere prejudice. If unfair prejudice simply meant prejudice, anything adverse to a litigant's case would be excludable under Rule 403. Emphasis must be placed on the word "unfair." Unfair prejudice is that quality of evidence which might result in an improper basis for a jury decision. Consequently, if the evidence arouses the jury's emotional sympathies, evokes a sense of horror, or appeals to an instinct to punish, the evidence may be unfairly prejudicial. Usually, although not always, unfairly prejudicial

---

[2] We note that Bennett's counsel objected to the following testimony by Sergeant Kocheran which was sustained by the trial court: "I spoke with [J.W.] a day or two later and she advised that she had gone to two hospitals and was not able to make contact with a SANE nurse." (Trial, T.p. 69) The timing of the second phone call was after a report was completed and the sergeant forwarded the case to another division. Thus, the testimony could not arguably be for the purpose of explaining the progression of the investigation and was properly sustained by the trial court.

evidence appeals to the jury's emotions rather than intellect.' " *Oberlin v. Akron Gen. Med. Ctr.* (2001), 91 Ohio St.3d 169, 172, 743 N.E.2d 890, quoting Weissenberger's Ohio Evidence (2000) 85– 87, Section 403.3.

*State v. Cotts*, 104 Ohio St.3d 432, 2004-Ohio-6550, 820 N.E.2d 302, ¶ 24.

**{¶46}** We do not find that the testimony appealed to the jury's emotions as to have unfairly prejudiced Bennett. The jury was previously informed of the charge Bennett is alleged of committing and that the victim was I.W. Furthermore, the sergeant did not comment on the credibility of the victim's mother, J.W., or that he reacted emotionally to the information relayed to him. Finally, Sergeant Kocheran did not connect Bennett to the crime as he specifically stated that J.W. was yet to provide him with the name of the offender.

**{¶47}** Accordingly, we conclude that had Bennett's counsel objected such an objection would not have been sustained, and also find that Bennett fails to demonstrate that the evidence affected the outcome of the case. As we elaborate more in the third assignment of error, there is direct evidence of Bennett forcefully having intercourse with I.W. through her testimony and his own admission. We, thus, reject Bennett's assertion that his trial counsel was ineffective.

## B. J.W.'s Testimony

**{¶48}** J.W. testified that she reached out to Bennett's mother and

asked her if her husband was there – Chuck, and he was. I said well, I need to speak with both of you and um, I said that your son forced himself on my daughter and she asked which one? And she said which daughter, and I said [I.W.], and she told me to call the police. Then, as we were on the phone, she said Jacob just pulled in and they asked him and she told me that he did not deny it.

**{¶49}** J.W. also explained the next step she took which was to contact

Ross County Sheriff's office and spoke with Sergeant Kocheran via telephone.

J.W. explained that she called the sheriff's office because she did not know the

details of what happened to I.W. "so I was trying to I guess, understand the

process and the procedure of what to do."  Following that testimony, the

prosecutor questioned J.W.:

> Q: And did you take your daughter to a forensic interview at the child protection center here in Chillicothe, Ohio?
> A: Yes, but before that we went to two hospitals.
> Q: What was the purpose going to the two hospitals?
> A: Because we were advised to have an exam, the SANE exam completed.
> Q: And is the SANE Exam a sexual assault exam?
> A: Yes.
> * * *
> Q: What hospitals did you go to?
> A: We went, we called Logan and they said that they had somebody to do that. So, we went to Logan but when we got there, they said that they were sorry but that person was actually in a supervising position that night so we could not do that. So, they called Lancaster and we went to Lancaster – they said they had somebody there, so we went there and we went through the whole E.R. process and everything but then at one o'clock in the morning they said that they still had to call that person in; but she received the overall exam, but not a SANE exam[.]

**{¶50}** Bennett's counsel failed to object to any of the above testimony by

J.W. which he maintains falls below a reasonable standard of representation and

prejudiced him.  Bennett's sole basis for a claim of prejudice is that the evidence

contradicted his defense theory of consensual intercourse.  But prejudice in this

context is more than that; it must affect the result of the proceeding and

undermine the confidence in the outcome of the trial.  *See Strickland*, 466 U.S.

668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

{¶51} Bennett fails to meet his burden of demonstrating prejudice.  The lack of a sexual assault examination and informing the jury that I.W. went to two hospitals did not affect the result of the proceedings and undermine the confidence in the outcome.  None of this evidence implicated Bennett.  Moreover, at trial, I.W. testified of Bennett's conduct of pulling her hair, pushing her against the wall, leaving bruises on her breast, pulling down her shorts and having intercourse against her will.  Similarly, Bennett's mother's statement that Bennett did not deny the assault was not prejudicial since the evidence submitted during trial included Bennett's messages to I.W. admitting to the forceful nature of sexually assaulting I.W.  Therefore, we overrule Bennett's second assignment of error because he fails to demonstrate that he received ineffective assistance of trial counsel.

ASSIGNMENT OF ERROR III

{¶52} In the third assignment of error, Bennett argues that force could not be demonstrated "based only on manipulation of clothing because that focuses on the 'force necessary to facilitate the act' " and "ignores the fact that 'the statute requires that some amount of force must be proven beyond that force inherent in the crime itself.' "  Bennett claims the evidence was insufficient that he purposely compelled I.W. to submit by force and that the force was sufficient to overcome her will.  Bennett similarly maintains that the manifest weight of the evidence is lacking as the victim testified that she fell down because he "kind of pushed me a little forward."  He thus concludes that "[b]ecause no evidence that Bennett purposedly (sic.) compelled the victim to submit by force was adduced at

trial, and because there was no force necessary to overcome the will of the victim, the evidence against Bennett was legally insufficient[,]" and the evidence weighed manifestly against conviction.

**{¶53}** The state disagrees and asserts that Bennett forcefully raped I.W., where she was crying, repeatedly told him to stop but he did not, and he pulled her hair and her clothing off. Further, Bennett left bruises on I.W.'s breast. Accordingly, the state established sufficient evidence to convict him and there is overwhelming evidence demonstrating Bennett's guilt by the manifest weight of the evidence.

Law and Analysis

**{¶54}** "Sufficiency" and "manifest weight" are two distinct legal concepts. *Eastley v. Volkman*, 132 Ohio St.3d 328, 2010-Ohio-2179, 972 N.E.2d 517, ¶ 23. When reviewing whether the evidence is sufficient to sustain a conviction, the focus is on the adequacy of the evidence. *See State v. Sims*, 4th Dist. Athens No. 21CA15, 2023-Ohio-1179, ¶ 115. Thus, "[t]he standard of review is whether, after viewing the probative evidence and inferences reasonably drawn therefrom in the light most favorable to the prosecution, any rational trier of fact could have found all the essential elements of the offense beyond a reasonable doubt." *Id*.

**{¶55}** In determining whether a criminal conviction is against the manifest weight of the evidence, an appellate court reviews the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction

must be reversed. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), citing *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). "Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." *C.E. Morris Co. v. Foley Const. Co.*, 54 Ohio St.2d 279, 376 N.E.2d 578 (1978), syllabus.

{¶56} The weight and credibility of evidence are to be determined by the trier of fact. *State v. Kirkland*, 140 Ohio St.3d 73, 2014-Ohio-1966, 15 N.E.3d 818, ¶ 132. The trier of fact "is free to believe all, part or none of the testimony of any witness," and we "defer to the trier of fact on these evidentiary weight and credibility issues because it is in the best position to gauge the witnesses' demeanor, gestures, and voice inflections, and to use these observations to weigh their credibility." *State v. Dillard*, 4th Dist. Meigs No. 13CA9, 2014-Ohio-4974, ¶ 28, citing *State v. West*, 4th Dist. Scioto No. 12CA3507, 2014-Ohio-1941, ¶ 23.

{¶57} In addition, "[a] verdict is not against the manifest weight of the evidence because the finder of fact chose to believe the State's witnesses." *State v. Chancey*, 4th Dist. Washington No. 15CA17, 2015-Ohio-5585, ¶ 36, citing *State v. Wilson,* 9th Dist. Lorain No. 12CA010263, 2014-Ohio-3182, ¶ 24, citing *State v. Martinez,* 9th Dist. Wayne No. 12CA0054, 2013-Ohio-3189, ¶ 16. Moreover, " '[w]hile the jury may take note of inconsistencies and resolve or discount them accordingly, * * * such inconsistences do not render defendant's conviction against the manifest weight or sufficiency of the evidence.' " *State v.*

*Corson*, 4th Dist. Pickaway No. 15CA4, 2015-Ohio-5332, ¶ 31, quoting *State v.*

*Proby*, 10th Dist. Franklin No.15AP-1067, 2015-Ohio-3364, ¶ 42, citing *State v.*

*Gullick*, 10th Dist. Franklin No. 13AP-317, 2014-Ohio-1642, ¶ 10.

**{¶58}** A finding that a conviction is supported by the manifest weight of the

evidence is "also dispositive of the issue of sufficiency." *Sims*, 4th Dist. Athens

No. 21CA15, 2023-Ohio-1179, ¶ 120, citing *State v. Waller*, 4th Dist. Adams No.

17CA1044, 2018-Ohio-2014, ¶ 30.

**{¶59}** Bennett was convicted of rape, a violation of R.C. 2907.02(A)(2) that

provides: "No person shall engage in sexual conduct with another when the

offender purposely compels the other person to submit by force or threat of

force."  Bennett challenges the force element of the offense claiming that

manipulating I.W.'s clothing is insufficient to demonstrate force and that no other

evidence was presented to establish force.  We disagree.[3]

**{¶60}** Force is defined in R.C. 2901.01(A)(1) as "any violence,

compulsion, or constraint physically exerted by any means upon or against a

person or thing."  Further,

> [t]he force and violence necessary to commit the crime of rape
> depends upon the age, size and strength of the parties and their
> relation to each other. With the filial obligation of obedience to a
> parent, the same degree of force and violence may not be required
> upon a person of tender years, as would be required were the parties
> more nearly equal in age, size and strength.

*State v. Eskridge*, 38 Ohio St.3d 56, 526 N.E.2d 304 (1988), paragraph one of
the syllabus.

---

[3] The force used in this case involved more than the removal of clothing.  But we take this opportunity to reiterate that courts, including this court, "have held that when a defendant removes the victim's clothing against the victim's will, then the element of force ordinarily will be established." *State v. Umphries*, 4th Dist. Ross No. 11CA3301, 2012-Ohio-4711, ¶ 17.

Moreover, "[a] defendant purposely compels another to submit to sexual conduct by force or threat of force if the defendant uses physical force against that person, or creates the belief that physical force will be used if the victim does not submit." *State v. Schaim*, 65 Ohio St.3d 51, 600 N.E.2d 661 (1992), paragraph one of the syllabus.

**{¶61}** " '[A] rape conviction may rest solely on the victim's testimony, if believed, and that 'there is no requirement that a rape victim's testimony be corroborated as a condition precedent to conviction.' " *State v. Lykins*, 4th Dist. Adams No. 18CA1079, 2019-Ohio-3316, ¶ 48, quoting *State v. Horsley*, 2018-Ohio-1591, 110 N.E.2d 624, ¶ 74 (4th Dist.). In the matter at bar, I.W. testified to Bennett's conduct of forcefully having intercourse with her.

**{¶62}** We first begin by noting that I.W. knew Bennett since she was eight years old as the two families attended the same church services. She was 17 years of age at the time of the sexual assault while Bennett was 25 years old, and that I.W. was homeschooled since she was 9 years old. Because of that familial history, I.W. testified that she was shocked by Bennett's conduct as the events developed and "didn't think that anything was going to happen. I trusted him enough to know that I was safe."

**{¶63}** Bennett betrayed that trust in which he pulled I.W.'s arm as he redirected her movement toward the barn area behind his house after she said it was best that they return back inside his parents' house. At the barn, Bennett pulled I.W.'s hair so hard that her head was throbbing for several days and would hurt when anyone touched her head. Bennett also pushed I.W. to reposition her

causing her to fall and hurt her knee in which a bruise developed. The conduct continued with Bennett touching I.W.'s breast so forcefully that even when wearing a bra and a shirt, he left two bruises on her breast. Bennett then pulled down I.W.'s shorts and had intercourse with her as she continually told him she did not want to do it, was crying, and urged him to just go back inside. I.W.'s testimony was sufficient to demonstrate that Bennett committed rape by purposely compelling I.W. to submit by force and the conviction is not against the manifest weight of the evidence simply because the jury believed I.W. What is more, the evidence included Bennett's own words apologizing to I.W. for "[f]orcing myself onto you. Doing that at all. I was trying so hard not to be a sex obsessed asshole to you[.] * * * I basically raped you[.]"

{¶64} Accordingly, we affirm Bennett's rape conviction and overrule his third assignment of error.

CONCLUSION

{¶65} Having overruled Bennett's three assignments of error, we affirm the trial court's judgment entry of conviction.

**JUDGMENT AFFIRMED.**

## JUDGMENT ENTRY

It is ordered that the JUDGMENT IS AFFIRMED and that appellant shall pay the costs.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Ross County Common Pleas Court to carry this judgment into execution.

IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed 60 days upon the bail previously posted.  The purpose of a continued stay is to allow Appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of proceedings in that court.  If a stay is continued by this entry, it will terminate at the earlier of the expiration of the 60-day period, or the failure of the Appellant to file a notice of appeal with the Supreme Court of Ohio in the 45-day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio.  Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of 60 days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Smith, P.J. and Hess, J.:  Concur in Judgment and Opinion.


For the Court,


BY: _____
Kristy S. Wilkin, Judge


## NOTICE TO COUNSEL

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**